Dwayne PEYTON and Darrell Jackson, Appellants,

v.

UNITED STATES, Appellee.

Nos. 96–CF–903, 96–CF–993.

District of Columbia Court of Appeals.

Argued Dec. 10, 1997.

Decided March 12, 1998.

Thomas G. Ross, appointed by the court, with whom Gregory C. Powell was on the brief, Centreville, MD, for appellant, Dwayne Peyton.

Bradford P. Johnson, Washington, DC, appointed by the court, for appellant, Darrell Jackson.

Stuart G. Nash, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and KING,* Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

These consolidated appeals present the question—one of first impression in this jurisdiction, though much-litigated elsewhere—whether the trial judge committed prejudicial error by refusing to declare a mistrial after a key prosecution witness volunteered, during his redirect examination, that he had taken a "lie detector" test. The issue is a troubling one, for even an indirect reference to the administration of a polygraph examination has a substantial potential for prejudice. In this case, however, the trial judge's prompt, thorough and effective admonition to the jury

* Associate Judge King concurs in the result.

minimized the possibility of such prejudice, and we conclude, in light of that admonition, that the judge did not abuse her discretion by denying appellants' motions for a mistrial. We are likewise unpersuaded by appellants' other contentions on appeal. Accordingly, we affirm their convictions.

## I.

## THE TRIAL COURT PROCEEDINGS

### A. *Background.*

On April 17, 1996, a jury found appellants Dwayne Peyton and Darrell Jackson guilty of first-degree murder while armed[1] and related weapons offenses[2] in connection with the shooting death on October 13, 1990 of Billy Hopkins. Hopkins was apparently murdered because Jackson believed that Hopkins was the man who shot and killed Jackson's friend, Cedric Boyd, on August 29, 1990. The principal prosecution witness, Kenneth Curtis, was with Boyd and Jackson when Boyd was murdered. Curtis claimed at trial that he was also on the scene of the October 13 retaliatory slaying, and that he had seen both Peyton and Jackson fire the fatal shots at Hopkins.

On October 30, 1990, seventeen days after Hopkins' death, Peyton was arrested,[3] charged with the murder, and detained without bond. On February 7, 1991, while Peyton remained in jail, Curtis appeared before a grand jury and testified that he had no knowledge of the identities of Hopkins' killers. Five days later, bail was set in Peyton's case, and he was ultimately released after posting bond. No indictment was returned against Peyton in 1991 and, on June 17 of that year, the case was dismissed for lack of prosecution.

More than three years later, on November 7, 1994, Curtis appeared before a grand jury for the second time. On this occasion, he testified that Peyton and Jackson were the two men who shot Hopkins. Two days later, on November 9, 1994, the grand jury returned an indictment charging both defendants with premeditated murder while armed, PFCV, and CPWOL. The government subsequently represented to the trial court that it was the emergence of Curtis as an eyewitness that "provided the breakthrough the government needed to refocus the investigation and indict [sic][4] the defendant."

### B. *The evidence at the trial.*[5]

Kenneth Curtis was the prosecution's star witness. He testified that on October 13, 1990, Peyton and Jackson were in a blue BMW near the intersection of East Capitol Street and Benning Road, near Texas Avenue. Curtis was behind them in another vehicle. Observing a man on the street, Jackson rolled up his window and asked Curtis: "Ain't that the dude that killed Ced?"[6] Curtis answered "Naw," but Jackson insisted that "[i]t is that motherfucker." Curtis testified that "I slowed up and came to the light and the next thing I know, I seen Darrell Jackson and Dwayne Peyton shooting the man down."

Curtis also testified that, some time prior to the shooting of Hopkins, he (Curtis) had purchased a number of firearms, including a 9mm Browning pistol and a 9mm Tanfoglio semi-automatic handgun, and that he had provided the Browning to Peyton and the Tanfoglio to Jackson. These weapons, which were apparently used in the fatal shooting of Hopkins, were subsequently recovered from the two defendants.[7]

---

1. D.C.Code §§ 22–2401, –3202 (1996).

2. Possession of a firearm during a crime of violence (PFCV), § 22–3204(b), and carrying a pistol without a license (CPWOL), § 22–3204(a).

3. Jackson was not charged with the crime until 1994.

4. It was, of course, the grand jury, and not the government, that indicted Peyton and Jackson.

5. There was extensive testimony at appellants' trial, which lasted two weeks from *voir dire* to verdict. We summarize only those portions of the evidence that bear on the issues presented for review.

6. The reference was to Cedric Boyd.

7. There was testimony that Jackson was arrested in the early morning hours of February 9, 1991, and that the Tanfoglio handgun was recovered from his person. There was also testimony that

On cross-examination, Curtis was impeached with prior statements to the grand jury and to the police in which he had denied any knowledge of the identities of the murderers. Curtis also admitted that he had previously been convicted of conspiracy to commit murder, several drug offenses, and a firearms offense. Curtis acknowledged that he did not disclose his knowledge of the Hopkins murder to the police until after he had been convicted of the most recent charges against him and faced the possibility of imprisonment for life. Curtis also testified that in return for his cooperation with the government, the prosecutor had requested major sentencing concessions on Curtis' behalf. Curtis was further impeached with alleged inconsistencies in his testimony; he had stated at different times, for example, that he had witnessed the events of October 13, 1990 through his side window, his windshield, and his rear-view mirror.

Curtis was the only witness who identified Jackson as one of the shooters. Crystal Walker, who was fifteen years old at the time of the killing, testified that she had seen Peyton, whom she knew, shooting at the decedent. Ms. Walker admitted, however, that she had lied to the police and to the grand jury, and that she had implicated two men other than Peyton and Jackson in the murder, even though she knew that these other men were innocent.[8]

Finally, the prosecution presented evidence showing that Peyton had lied to the police regarding the circumstances under which his car came to be at the murder scene, and that he had induced his girlfriend, Sabrina Pannell, to back up his lie.[9] There was also evidence that Jackson lied to the grand jury on the same subject.[10] The government argued that this deceptive conduct on appellants' part reflected consciousness of guilt.

Neither defendant testified. Peyton did not present a defense. Jackson called two witnesses, Dwight Sullivan and Sean Hatton. Sullivan testified that he had known Curtis for seven years, and that Curtis had a reputation in the community as a liar. Hatton claimed that, a few days after Hopkins' death, Curtis admitted to Hatton that he (Curtis) had killed the man who shot Cedric Boyd.[11]

Peyton was arrested in the early morning hours of April 20, 1991, while driving a station wagon, and that a 9mm Browning pistol was recovered under the driver's seat. A prosecution ballistics expert testified that the two weapons matched shell-casings that were recovered at the murder scene.

8. As a result of Ms. Walker's subsequently recanted charges, one of these two men, Antoine Holly, was arrested and formally charged with the murder. The charges against Holly were subsequently dismissed.

9. The blue BMW in which Peyton and Jackson were travelling was left near the scene of the shooting. It was registered to Peyton, and Jackson's non-driver's identification card was found under the floor mat on the passenger side.

Peyton told the police that he had lent his car to his girlfriend, Sabrina, because, according to Peyton, Sabrina wanted to go riding with her friend, Shanita Yarborough. He claimed that Sabrina had told him that the brakes failed and that the young women had parked the car at Texas Avenue and East Capitol Street. Sabrina Pannell gave a similar account to the police.

At trial five years later, however, Ms. Pannell testified that she had not driven the BMW and that the brakes had not failed. She stated that she had lied to the police about the events concerning the BMW because Peyton had asked her to do so. Ms. Pannell also testified that she had called Ms. Yarborough and had asked her to tell the police, falsely, that Ms. Yarborough was driving the car. Ms. Yarborough was supposed to explain to the police that she was driving because Ms. Pannell did not know how to operate a "stick shift."

Ms. Yarborough testified that she received a call at about 4 a.m. on October 13, 1990 from Sabrina Pannell. According to Ms. Yarborough, Ms. Pannell asked her to tell the police that she (Ms. Yarborough) had been driving. Ms. Yarborough learned that the police were pursuing a homicide investigation, and she refused to make the false statement that Ms. Pannell had requested her to make. Instead, Ms. Yarborough told the police the truth.

10. Jackson told the grand jury that Ms. Pannell had driven the BMW on the day of the shooting. He claimed that he had met Ms. Pannell while she was walking home, and that Ms. Pannell told him that the brakes had failed and that she had parked on Texas Avenue.

11. The parties stipulated that on February 15, 1991, when Hatton was a witness before the grand jury, he was asked whether he had "heard from anyone as to why this person was killed on Texas Avenue." Hatton's response was "No."

## C. *The reference to the polygraph test.*

After Curtis had been impeached on cross-examination with his failure in 1991 to disclose to the grand jury or to the police his knowledge of the *circumstances of Hopkins'* murder, the prosecutor attempted to rehabilitate his witness and to elicit the reasons for Curtis' initial lack of candor:

Q. My question, sir, is . . .—if you saw this, why didn't you just tell the grand jury what you saw?

A. Because the first time—I mean, the first time I went in front of the grand jury, it was a lie. So the second time when I went up to the grand jury, they had—they had me put on a lie detector test—

MR. JONES (Counsel for Peyton): Objection.

MR. DAUM (Counsel for Jackson): Objection. May we approach?

THE COURT: Sustained. No.

THE WITNESS:—a lie detector test—

THE COURT: No, no. Don't say anything about that. Sit down, please, gentlemen.

The questioning continued briefly, and the judge called counsel to the bench for a conference on an unrelated issue. While at the bench, Jackson's attorney moved for an immediate mistrial on the grounds that

[o]nce [Curtis] brought out that nonresponsive answer about the polygraph, I think he's poisoned the well. This is a first-degree murder case. He's essentially suggesting to the jury that someone else is vouching for his credibility.

Peyton's counsel made a similar motion. He argued that

it's laying out there in the air now. They know that a polygraph was given and the inference is that he passed it. Why would he say it if he didn't?

The judge denied the motion for a mistrial, but offered to give a "convincing" instruction directing the jury to disregard the reference to the polygraph. Without objection from counsel, the judge then told the jurors that she wanted them "to strike the reference by

this witness to any polygraph test." The judge continued:

In this jurisdiction, polygraph tests are not admissible evidence because the science hasn't developed enough to be sufficiently sound to be reliable evidence. Not only that, but we don't know—you certainly don't know the results of any polygraph test, and not only that, but you don't know what questions were asked to lead to those results.

So when I ask you to strike, I mean for you to do that, and what I mean by that is to make certain that whatever your verdict is in the case, it never makes any reference whatsoever to the comment about a polygraph test.

The last thing I want to tell you is, because it isn't admissible evidence or competent evidence, nobody else is going to be permitted, neither defense counsel nor the government counsel, to discuss that any further. So let's disregard it and move on.

Curtis then testified that, in 1991, "I lied and told the grand jury that Dwayne Peyton and Darrell Jackson [weren't], you know, the killers to the case." He stated that the truth about the murder was "I seen Darrell Jackson and Dwayne Peyton and I went to the [1994] grand jury and testified."

There was no further reference at the trial to a polygraph test. Both defendants were convicted of all charges.

## II.

## LEGAL DISCUSSION

### A. *Standard of review.*

Peyton contends on appeal that the trial judge committed reversible error by declining to declare a mistrial following Curtis' statement that "they had put me on a lie detector." [12] He acknowledges that the trial judge gave the jury an "exemplary" admonition to disregard Curtis' statement, but insists that

12. Although Jackson's trial counsel moved forcefully for a mistrial, his appellate attorney has not

pursued the issue in this court. See note 21, *infra*.

an instruction under these circumstances would not mitigate the damage done to Appellant's case, because the effect of this statement is that, while [Curtis] lied in his first Grand Jury appearance, his second Grand Jury testimony was monitored by a polygraph and must therefore be conclusively correct and credible. There is little question that any reasonable juror would draw the inference that Curtis' testimony was entitled to special deference. *Cf. Bruton v. United States,* 391 U.S. 123, 129 n. 4, 88 S.Ct. 1620, 1624 n. 4, 20 L.Ed.2d 476 (1968) (discussion of circumstances where instructions may be ineffective).

■ A motion for a mistrial is confided to the sound discretion of the trial judge. *Lee v. United States,* 562 A.2d 1202, 1204 (D.C. 1989). The exercise of that discretion will be overturned only if the judge's decision is unreasonable and threatens a miscarriage of justice. *Id.; see also Bragdon v. United States,* 668 A.2d 403, 405 n. 2 (D.C.1995) (per curiam). As the Maryland Court of Appeals explained in a case which involved references to polygraph examinations by prosecution witnesses,

> [t]he fundamental rationale in leaving the matter of prejudice *vel non* to the sound discretion of the trial judge is that the judge is in the best position to evaluate it. The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial.

*State v. Hawkins,* 326 Md. 270, 604 A.2d 489, 493 (1992).

■ "A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Salmon v. United States,* — A.2d —, —, No. 96–CM–1131, slip op. at 14, 1997 WL 703058 (D.C. Nov. 13, 1997) (quoting *United States v. Clarke,* 306 U.S.App. D.C. 251, 264, 24 F.3d 257, 270 (1994)). Especially in a complex murder case like this one, a mistrial entails substantial social costs, both in terms of the time and resources of all trial participants, and because it is often difficult, years after the fact, to put Humpty–Dumpty together again and to reassemble the relevant evidence for a second trial. *Cf. Salmon, supra,* slip. op. at 14–15, — A.2d at — – —; *see also United States v. Mechanik,* 475 U.S. 66, 72, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986). We must therefore review, under a deferential abuse-of-discretion standard, the judge's determination that the right of the defendants to a fair trial could be effectively secured by means of an instruction to the jury, without aborting the proceedings and compelling the parties to begin all over again.

B. *The disclosure of a polygraph examination—basic legal principles.*

"[I]t is well settled that the results of lie detector tests are inadmissible in this jurisdiction." *Contee v. United States,* 667 A.2d 103, 104 n. 4 (D.C.1995) (per curiam) (citing, *inter alia, Frye v. United States,* 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923)). There appears to be no District of Columbia precedent, however, on the question whether, and under what circumstances, a reference by a witness to the administration to him or her of a polygraph test requires the trial judge to declare a mistrial. Because the issue has been widely litigated in many other jurisdictions, *see* Michelle Migdal Gee, Annotation, *Propriety and prejudicial effect of informing jury that witness in criminal prosecution has taken polygraph test,* 15 A.L.R.4th 824 (1982 & Supp.1997), including Maryland, *see, e.g., Hawkins, supra,* 604 A.2d at 492–94; *Guesfeird v. State,* 300 Md. 653, 480 A.2d 800, 802–07 (1984); *Lusby v. State,* 217 Md. 191, 141 A.2d 893, 895 (1958), we look to the decisions of other courts for guidance.

■ In *Guesfeird, supra,* the Maryland Court of Appeals surveyed the authorities and extracted from the case law certain basic principles. The court began by noting that "[t]he results of a lie detector test, as well as the fact of taking such a test, are not admissible." 480 A.2d at 803 (citations omitted). The court recognized, however, that "[a] reference to a lie detector test in a criminal trial is not ground for reversal if the result of the test cannot be inferred from the circum-

stances or if the reference is not prejudicial to the defendant." *Id.* (citations omitted).[13] The court then explored a number of criteria for assessing prejudice:

> In determining whether evidence of a lie detector test was so prejudicial that it denied the defendant a fair trial, courts have looked at many factors. The factors that have been considered include: (1) whether the reference to a lie detector was repeated or whether it was a single, isolated statement; (2) whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; (3) whether the witness making the reference is the principal witness upon whom the entire prosecution depends; (4) whether credibility is a crucial issue; (5) whether a great deal of other evidence exists; and, (6) whether an inference as to the result of the test can be drawn. *See, e.g., People v. Yatooma,* 85 Mich.App. 236, 271 N.W.2d 184, 186–87 (1978) (factors listed); and cases discussed *infra; see generally* Annot., 15 A.L.R.4th 824 (1982). No single factor is determinative in any case. The factors themselves are not the test, but rather, they help to evaluate whether the defendant was prejudiced.

*Id.* (numerals added).

### C. *Indicia as to prejudice.*

Using the analysis in *Guesfeird* as a guide, we now consider each of the factors there enumerated, as well as the trial judge's response, to determine whether, under all of the circumstances, Curtis' reference to the polygraph test denied the defendants a fair trial.[14]

#### (1) *Repeated or isolated reference.*

In the present case, Curtis referred to a "lie detector" in two successive answers. The defense objections were sustained and, a few minutes later, the judge admonished the jury not to consider these references. The jury heard nothing further about polygraph tests.

A number of courts have held that a "brief and inadvertent reference to a polygraph examination" was not sufficient to bring about a miscarriage of justice, and that reversal of the defendant's conviction was not required. *See People v. Whitfield,* 58 Mich. App. 585, 228 N.W.2d 475, 477 (1975) (citing cases). "[W]e cannot say that this one utterance [regarding a witness' polygraph examination] caused a miscarriage of justice which would necessitate a reversal of the conviction." *Sullivan v. State,* 303 So.2d 632, 636 (Fla.1974), *cert. denied,* 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976); *see also State v. Farrar,* 309 Or. 132, 786 P.2d 161, 182(Or.), *cert. denied,* 498 U.S. 879, 111 S.Ct. 212, 112 L.Ed.2d 171 (1990) ("[t]he reference did not warrant a mistrial because it was isolated and made only in passing, the results of the test were not disclosed, and the state never argued that the test had any significance to the witness's credibility or to any other issue in the case"). The brevity of Curtis' allusions to the polygraph thus tilts in some measure in the government's favor.

We agree with the Supreme Court of Maine, however, that "[t]he fact that the reference is isolated and inadvertent does not alone insure that the reference is not prejudicial." *State v. Edwards,* 412 A.2d 983, 985 (Me.1980). Sometimes, even "a drop of ink cannot be removed from a glass of milk." *Thompson v. United States,* 546 A.2d 414, 425 (D.C.1988) (quoting *Government of Virgin Islands v. Toto,* 529 F.2d 278, 283 (3d Cir.1976)).

#### (2) *Inadvertent or solicited statement.*

There is no evidence that the prosecutor prompted or encouraged Curtis to mention, in the presence of the jury, the administration to him of a polygraph examination. In sustaining the convictions of defendants notwithstanding such a disclosure, some courts have attached significance to the fact that the witness' reference to the examination was not solicited. *See, e.g., United States v. Wyant,* 576 F.2d 1312, 1319 (8th Cir.1978) ("brief unsolicited statement"); *People v. Price,* 1 Cal.4th 324, 3 Cal.Rptr.2d 106, 165, 821 P.2d

---

**13.** "Despite its status as a pariah, however, not all references to polygraph tests warrant reversal." *Hawkins, supra,* 604 A.2d at 492.

**14.** In *Guesfeird,* the defendant's conviction was reversed. 480 A.2d at 807.

610, 669 (1991) (reference was "brief and non-responsive"), *cert. denied,* 506 U.S. 851, 113 S.Ct. 152, 121 L.Ed.2d 102 (1992); *Hawkins, supra,* 604 A.2d at 493 (references to polygraph were "inadvertent, uttered abruptly and impulsively, with no nefarious intent"). But "[a]lthough ... a solicited reference certainly is more egregious, it is only one factor and is not the determinative test." *Guesfeird, supra,* 480 A.2d at 804. As the Supreme Court of Maine has explained, "[a] prosecutor has an obligation to caution his or her witnesses against testifying as to specific facts that the prosecutor knows are inadmissible." *Edwards, supra,* 412 A.2d at 987 n. 3. A failure to fulfill that obligation may result in substantial prejudice. *Id; see also Smith v. State,* 537 N.E.2d 496, 497 (Ind.1989).

### (3) *Importance of the witness.*

There can be no doubt that Curtis was a vital witness for the prosecution. He was the only witness who identified both defendants as participants in Hopkins' murder. Indeed, as we have seen, the government represented to the trial court that it was Curtis' emergence as a witness that enabled prosecutors to secure an indictment when the case had been dormant for more than three years. Although a conviction may properly be sustained notwithstanding the disclosure that a polygraph examination was administered to a "non-crucial" witness, *see, e.g., United States v. Smith,* 565 F.2d 292, 295 (4th Cir.1977), this is not such a case.

### (4) *Significance of Curtis' credibility.*

The disclosure that a witness has taken a polygraph examination is potentially prejudicial only if the credibility of that witness is a significant issue. *See, e.g., Edwards, supra,* 412 A.2d at 986 ("the most important factor is that the credibility of Ann was a crucial issue"); *Whitfield, supra,* 228 N.W.2d at 478 (the court must determine whether the witness' credibility "played a vital role in the case"). In the present case, Curtis' credibility was a major issue, although by no means the only one.

### (5) *The existence of other evidence.*

Curtis' testimony was undoubtedly the linchpin of the prosecution's case, but the government also presented ballistics evidence which the jury might well have found quite persuasive. In addition, there was proof that both defendants, and especially Peyton, concocted an exculpatory explanation of the presence of the BMW at the murder scene, and that this fabrication reflected consciousness of guilt on their part. *See, e.g., Mills v. United States,* 599 A.2d 775, 783–84 (D.C. 1991) (citations omitted).[15]

### (6) *Disclosure or non-disclosure of the results of the polygraph test.*

In his brief allusion to the "lie detector," Curtis did not directly reveal the results of the test or, indeed, its precise subject matter. Nevertheless, he testified that he had lied to the 1991 grand jury by denying that he knew the identities of the perpetrators of the crime. He disclosed that it was on "the second time when I went up to the grand jury"—an occasion on which he incriminated Peyton and Jackson—that police or prosecutors "had me put on a lie detector test." From that sequence of events, and from the context in which Curtis volunteered information about the polygraph, the jury could reasonably infer that Curtis was attempting to contrast his pre-polygraph lies with what he asserted to be his post-polygraph truthfulness. Curtis' reference to the "lie detector" could thus be construed as a claim on his part that an ostensibly scientific machine had corroborated and vouched for his testimony against Peyton and Jackson.

In *Commonwealth v. Johnson,* 441 Pa. 237, 272 A.2d 467 (1971), a prosecution witness testified that he had initially lied to protect the defendant, but that he had changed his story after visiting the municipal building. In response to a question from the prosecutor, the witness disclosed that he was at that building to take a "lie detector" test, and that it was after he took the test that he first provided his new account, which inculpated the defendant. The court reversed the defendant's conviction, holding that the refer-

---

**15.** It must be acknowledged, at the same time, that the record for truth and veracity of the prosecution's two identification witnesses—Kenneth Curtis and Crystal Walker—was less than exemplary.

ence to the polygraph "unavoidably raised an inadmissible inference of the test result." *Id.* 272 A.2d at 469 (citation omitted). *See also State v. Kilpatrick,* 2 Kan.App.2d 349, 578 P.2d 1147, 1148–49 (1978) (where one complainant testified that she had fabricated a sex abuse charge, and where no prosecution was undertaken after this complainant failed a polygraph examination, and where a second complainant testified that she took a polygraph examination, and the jury learned that prosecution of the defendant followed, the effect of this sequence was to reveal to the jury the result of the test given to the second complainant, and the defendant's conviction was reversed).

D. *The efficacy of the trial judge's instruction.*

The foregoing discussion of the six *Guesfeird* factors reveals that although they do not all tilt in the same direction, Curtis' disclosure surely had a significant potential for prejudice, at least in the absence of effective counter-measures by the judge. The case is a close one and, in our view, turns squarely on the efficacy of the trial judge's remedial instruction to the jury.

In that instruction, the judge did not confine herself to a directive that the jury disregard Curtis' comment about a "lie detector." Rather, she explained to the jury that the "science hasn't developed enough" to permit the admission into evidence of the results of a polygraph test. Further, the judge reminded the jurors that they did not know the results of any polygraph examination that may have been administered to Curtis, nor were they aware of the particular questions that may have been asked.[16] The judge concluded her admonition with a forceful prohibition against any further reference to polygraphs by any participant in the trial or by any juror.

Taken as a whole, the judge's instruction was not a *pro forma* and self-defeating admo-

nition not to think about a pink elephant. On the contrary, the judge explained to the jurors, in rational and persuasive terms, why speculation about any hypothetical polygraph test would be unfair and unwarranted. A juror who, notwithstanding the judge's admonition, might have attempted to argue for conviction during deliberations on the basis of the stricken polygraph evidence would surely have faced a skeptical reception from his or her colleagues on the jury.

Generally, in the words of Justice Holmes, "[i]t would be absurd to upset a verdict upon a speculation that the jury did not do their duty and follow the instructions of the court." *Graham v. United States,* 231 U.S. 474, 481, 34 S.Ct. 148, 152, 58 L.Ed. 319 (1913); *Coates v. United States,* 558 A.2d 1148, 1150 (D.C.1989) (quoting *Graham* ). To be sure, we have recognized that there are circumstances in which

> one cannot unring a bell; after the thrust of the saber it is difficult to say forget the wound; and finally, if you throw a skunk into the jury box, you can't instruct the jury not to smell it.

*Thompson, supra,* 546 A.2d at 425 (quoting *Dunn v. United States,* 307 F.2d 883, 886 (5th Cir.1962)).[17] Nevertheless, we reiterated in *Thompson* our presumption that the jury is able to follow the judge's instructions, and we stated that our theory of trial depends on our belief in the jury's ability to do so. *Id.* (citations omitted). Where, as in this case, the judge's instruction was prompt, complete, persuasive, and to the point, we should not readily assume that the jury could not or would not follow it.

■ Although some courts have disagreed, the overwhelming weight of authority in cases involving the disclosure that a witness took a polygraph test supports the position that an effective instruction by the judge is sufficient to avoid a mistrial. *See, e.g., Price,*

16. The latter point is important. The reader will recall the claim by the defense that Curtis himself was the killer of Hopkins, and that Curtis had admitted his responsibility for that crime to defense witness Sean Hatton. Any polygraph examination could plausibly have concerned Curtis' own guilt.

17. Indeed, in *Smith, supra,* 537 N.E.2d at 497, the Supreme Court of Indiana described the prosecutor's repeated and deliberate evaluation of references to polygraph examinations as the "*traditional ringing of a bell that could not be unrung*" (citation omitted), and as "utterly inexcusable."

*supra,* 3 Cal.Rptr.2d at 165, 821 P.2d at 669 (where the trial judge "strongly admonished the jurors to disregard [a prosecution witness'] mention of polygraphs because polygraph results are both scientifically unreliable and legally inadmissible in evidence," the admonition was "thorough and forceful" and sufficient to prevent any prejudice to the defendant); *Commonwealth v. Brinkley,* 505 Pa. 442, 480 A.2d 980, 986 (1984) (because the trial judge issued "immediate and extensive instructions regarding the unreliability and inadmissibility of polygraph tests and caution[ed] the jury to disregard any testimony concerning such tests," the defendant "could not have been prejudiced" and his motion for a mistrial was properly denied); *Beal v. State,* 453 N.E.2d 190, 193 (Ind.1983) (affirming the defendant's conviction despite a prosecution witness' unsolicited disclosure that she had taken a polygraph examination where, *inter alia* and *"[m]ost importantly,* the trial court admonished the jury to disregard the statement and instructed the jury not to take it into account in their deliberations") (emphasis added); *State v. Okumura,* 78 Hawai'i 383, 894 P.2d 80, 95 (1995) (dictum) (an admonition to the jury to disregard a witness' statement that he took a polygraph test could have "eradicated or minimized" the harmful effects of the testimony); *State v. Atwood,* 171 Ariz. 576, 832 P.2d 593, 625–26 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993) ("any possible error was rendered harmless by the court's immediate instruction to the jury to disregard the witness's answer [relating to taking polygraph test]"); Annotation, *supra,* 15 A.L.R.4th at 832–50 & Supp.1997 at 185–91 (citing numerous additional authorities).

In *United States v. Dietrich,* 854 F.2d 1056, 1058–59 (7th Cir.1988), a case in which a witness had volunteered that he had taken a polygraph test, the trial judge's relatively perfunctory instruction to the jury that "the remark of the ... witness is stricken from the record, and I will admonish this jury to disregard it" was held sufficient to cure any prejudice, and the appellate court rejected the defendant's contention that a more detailed instruction was required.

Some courts have expressed the view that an admonition to the jury on this particular issue may do more harm than good. In *Guesfeird,* for example, the court deemed it "arguable that rather than being curative, such an instruction might only serve to emphasize the prejudice." 480 A.2d at 807 (citations omitted).[18] In *Nichols v. State,* 378 S.W.2d 335 (Tex.Crim.App.1964), the court went further, holding (over a strong dissent) that where the prosecutor asked the complainant in a statutory rape case whether she had taken a polygraph test and the witness had answered in the affirmative, "the harm done was so great that no instruction from the court could remove it." *Id.* at 337. But whether or not these cases are distinguishable from the present one,[19] we have previously, albeit in a different context, abjured "excessive mistrust of juries." *See Allen v. United States,* 603 A.2d 1219, 1224 (D.C.) (en banc) (citation omitted), *cert. denied,* 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992). At least on this record, with this forceful instruction, we adhere to that approach today. It would, of course, have been better if Curtis had not foregone his golden opportunity to remain silent on the subject of

**18.** It was not always thus in Maryland. In *Lusby, supra,* the court stated, under similar circumstances, that "the prompt action of [the trial judge], in instructing the jury to disregard the answer of the prosecutrix, *fully satisfied the right of the defendant to a fair trial."* 141 A.2d at 895 (emphasis added).

**19.** The court in *Guesfeird* was not confronted with an instruction as forceful and complete as the one provided by the judge in the case now before us. Rather, without consulting counsel, the trial judge gave what the appellate court described as "a cautionary instruction to the jury to disregard any evidence of a lie detector test." *Guesfeird, supra,* 480 A.2d at 802. The defense

promptly objected to the instruction "because of the emphasis it had created." *Id.*

The result in *Nichols* appears to turn on the prosecutor's deliberate elicitation of the testimony regarding the polygraph test. 378 S.W.2d at 337–38. In *Richardson v. State,* 624 S.W.2d 912 (Tex.Crim.App.1981), on the other hand, the same court held, without mentioning *Nichols,* that "where a witness gives an unresponsive answer which mentions a polygraph test but does not mention the results of such test, there is no error in failing to grant a mistrial where the objection has been sustained and the jury instructed to disregard." *Id.* at 914–15 (citations omitted).

the "lie detector." Nevertheless, the defendants received a fair trial.

## III.

## CONCLUSION

The remaining contentions presented for our consideration by Peyton[20] and Jackson[21] are unpersuasive. Accordingly, both defendants' convictions are hereby

*Affirmed.*

---

**20.** Both appellants contend that the identification evidence against them was insufficient and that the prosecution failed to prove the deliberation and premeditation elements of first-degree murder. We disagree with them as to both issues. *See Mills, supra,* 599 A.2d at 781; *Watson v. United States,* 501 A.2d 791, 794–95 (D.C. 1985).

Peyton next asserts that he was denied his constitutional right to a speedy trial. This contention hinges, however, on Peyton's legally erroneous inclusion in the "speedy trial" calculus of the period from June 17, 1991, when the original charges against him were dismissed for want of prosecution, to November 9, 1994, when Peyton was indicted. *See United States v. Loud Hawk,* 474 U.S. 302, 311, 106 S.Ct. 648, 654, 88 L.Ed.2d 640 (1986); *In re D.H.,* 666 A.2d 462, 473 (D.C.1995). Peyton does not argue that the delay following his 1994 indictment implicated speedy trial concerns. To the extent that Peyton contends that his Fifth Amendment due process rights were violated by excessive pre-indictment delay, he has not demonstrated the actual prejudice which is required in order to establish such a claim. *See United States v. Lovasco,* 431 U.S. 783, 789–90, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977).

Finally Peyton asserts that the trial judge erroneously admitted the Browning 9mm pistol which was recovered from Peyton's possession five months after the murder. The prosecution's firearms expert linked the pistol to shells recovered at the scene of Hopkins' murder, however, and the weapon therefore constituted "direct and substantial proof of the charged crime." *Johnson v. United States,* 683 A.2d 1087, 1098 (D.C. 1996) (en banc), *cert. denied,* — U.S. ——, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). The evidence was therefore properly admitted.

**21.** Jackson claims that the trial judge abused her discretion when she denied his motion to sever

defendants pursuant to Super. Ct.Crim. R. 14. He contends that he was entitled to a severance because, according to him, the case against him was weaker than the case against Peyton. To prevail on such a claim, Jackson was required to prove that his own complicity was *"de minimis"* when compared to Peyton's. *Scott v. United States,* 619 A.2d 917, 930 (D.C.1993); *see Payne v. United States,* 516 A.2d 484, 489 (D.C.1986). Given, *inter alia,* Curtis' testimony that Jackson fired several shots at the decedent, the judge did not abuse her discretion in denying Jackson's motion.

Jackson also contends that the trial judge erred by admitting as "hearsay" Jackson's testimony before the grand jury relating to the presence of the BMW at the murder scene. The grand jury testimony was not hearsay because, *inter alia,* it was not offered to prove the truth of the matter asserted. *Carter v. United States,* 614 A.2d 542, 545 n. 9 (D.C.1992). On the contrary, the testimony was introduced to establish that Jackson told an exculpatory lie to the grand jury, under oath. The evidence was thus probative of Jackson's consciousness of guilt, *see Roy v. United States,* 652 A.2d 1098, 1108 n. 22 (D.C.1995), and the trial judge properly admitted it.

Although Jackson's trial counsel made a motion for a mistrial following Curtis' reference to a polygraph test, his appellate attorney unaccountably failed to raise the issue on appeal, nor did he join Peyton's appellate counsel's brief allusion to it. Because we have concluded that Peyton's rights were not violated, we need not decide whether a successful claim of reversible error by Peyton would have inured to Jackson's benefit in spite of Jackson's appellate counsel's failure to raise it. *Cf. Gibson v. United States,* 649 A.2d 593, 595 & n. 5 (D.C.1994); *see also id.* at 598 n. 3 (Steadman, J., dissenting).