Nathan E. WELCH, Appellant

v.

UNITED STATES, Appellee.

Nos. 97–CF–1671, 99–CO–1130.

District of Columbia Court of Appeals.

Argued Sept. 20, 2001.

Decided Sept. 26, 2002.

Peter H. Meyers, Washington, DC, appointed by the court, for appellant.

Elana Tyrangiel, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Mary Patrice Brown, Jennifer M. Anderson, Melanie I. Sloan, and Vincent W. Caputy, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and REID, Associate Judges.

TERRY, Associate Judge:

■ Appellant was convicted of first-degree premeditated murder while armed, first-degree felony murder while armed, armed robbery, possession of a firearm during a crime of violence, and carrying a pistol without a license. On appeal from the judgment of conviction, he contends that he was prejudiced when the trial court improperly admitted evidence of other crimes and when a government witness revealed during cross-examination that he had taken a polygraph test. Appellant also filed a post-trial motion to vacate his sentence under D.C.Code § 23–110 (2001), contending, among other things, that his trial counsel was ineffective because he failed to notify the court of a sleeping juror. The § 23–110 motion was denied after a hearing on the sleeping juror issue, and appellant noted a second appeal, which we consolidated with the direct appeal

from his convictions. We now affirm the judgment of conviction on the merits, and also affirm the denial of the § 23–110 motion. We remand the case, however to enable the trial court to vacate certain merging convictions and resentence accordingly.[1]

## I

Appellant Welch was charged with murdering Michael Tyson and stealing Tyson's Nissan Pathfinder truck during the early morning hours of February 27, 1996. The government presented its case mainly through two key witnesses and DNA evidence.[2]

Donna Belton, the first witness, was a cousin of the decedent. She testified that on the day he was killed, Mr. Tyson visited her at her home in the early morning, and the two of them smoked crack cocaine. Afterwards Ms. Belton went to a nearby gas station to buy some cigarettes, and while she was there, she met appellant, whom she knew to be a drug dealer. When he complained that "business was slow" in his area, Ms. Belton invited him back to her home in order to sell his drugs there. Because appellant did not have any drugs with him, Ms. Belton also offered to ask her cousin to give him a ride to pick them up. During a conversation on the way back from the gas station, Ms. Belton and appellant agreed that Ms. Belton would have sex with him in exchange for $8.00.

After Ms. Belton and appellant had sex, Mr. Tyson agreed to give appellant a ride in return for some of his drugs. Tyson left with appellant, and Ms. Belton never saw him alive again. Appellant, however, returned about an hour and a half later along with another man named Antwone Andrews. Appellant told Ms. Belton that Tyson had dropped them off at a Safeway store and that they had walked back to her home from there. Andrews was carrying a T-shirt that appeared to have blood on it. When Ms. Belton asked about it, appellant said that the T-shirt belonged to him and that it was "dirty" because he had blown his nose on it. Appellant then gave Ms. Belton some drugs, and he and Andrews left together. Andrews later returned by himself and had sex with Ms. Belton in exchange for drugs.

Antwone Andrews, the other principal government witness, had pleaded guilty to being an accessory after the fact of murder and testified at appellant's trial pursuant to his plea agreement. He said that appellant and Tyson had picked him up in a Pathfinder truck so that he could sell drugs in order to raise money to buy a gift for his daughter's birthday. Tyson drove them all to the corner of First Street and Rhode Island Avenue, Northwest. There appellant got out of the truck, supposedly to retrieve his drugs from a hidden location behind a sign. Instead of getting drugs, however, appellant returned to the truck with a gun, said, "Man give that [expletive] up," and shot Tyson three times in the head. Appellant and Andrews then placed the body in the back seat, drove to a nearby Safeway parking lot, and buried the body in a snowbank, where it was

1. Appellant argues, and the government concedes, that his convictions of felony murder and premeditated murder of the same victim merge, as do his convictions of felony murder and armed robbery. We vacate all of the sentences and remand the case to the trial court solely for resentencing. *See Thorne v. United States*, 471 A.2d 247, 249 (D.C.1983) (case remanded so that trial court could give effect to its "interdependent sentencing structure").

2. DNA is a widely used abbreviation for deoxyribonucleic acid. *See generally United States v. Porter*, 618 A.2d 629 (D.C.1992).

discovered several days later. Andrews and appellant returned to Ms. Belton's home for a short time, then went to the home of appellant's girl friend. There they all "got high" on "some weed," and Andrews fell asleep in a chair and spent the night. The next day Andrews and appellant went to the home of appellant's father. They stayed there for a while, and then appellant gave Andrews the keys to Tyson's truck. Andrews took the truck and drove to the home of his girl friend.[3]

The government also presented evidence that appellant, after learning that Andrews had implicated him in the crime, directed Andrews to write a letter to the government exculpating him; that appellant had telephoned a friend from prison and said that Andrews had "snitched on him"; that two of the bullets fired into Tyson's head had come from the same gun;[4] that blood-stained jeans were recovered from appellant's home; and that DNA testing showed that the blood on the jeans and blood found in the Pathfinder truck matched that of Mr. Tyson.

The defense sought to implicate Mr. Andrews as the actual murderer. Appellant's father and stepmother testified that Andrews had come to their house approximately two weeks before appellant's arrest and dropped off a plastic bag which may have contained clothing.[5] The defense theory was that the bag contained the jeans that were stained with Tyson's blood. Two other defense witnesses denied hav-

ing seen appellant and Andrews in a Pathfinder truck at First Street and Rhode Island Avenue, contrary to the testimony of Andrews placing those witnesses there. Appellant did not testify.

## II

Appellant argues that the trial court erred in two respects—first, by improperly admitting evidence of other crimes, and second, by allowing the jury to hear testimony that a government witness took a lie detector test—and that the cumulative effect of these errors warrants reversal. We hold that the trial court did not err in either instance.

### A. *The Other Crimes Evidence*

■ Generally, evidence of other crimes is not admissible, but there are several well-established exceptions to that rule. *See Drew v. United States,* 118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). This court has held, in particular, that

> such evidence is admissible when relevant to explain the immediate circumstances surrounding the offense charged.... It is admissible "to complete the story of the crime on trial by proving its immediate context." ... In fact, this limited class of evidence is not other crimes evidence because it is too intimately entangled with the charged criminal conduct.

---

3. Some time later the truck was found by the police parked near Andrews' home. The police towed it to the Seventh District police station. Thinking that his fingerprints might be on the truck, Andrews went to the station and tried to remove it from the impoundment lot. The police caught him as he tried to start the engine and placed him under arrest for trying to steal the truck. When the police tried to locate the owner, they learned that he had been the victim of a homicide.

4. The government's expert could not determine whether the third bullet had been fired from the same gun because it was in fragments.

5. Appellant's stepmother thought the bag contained clothing, but she never actually saw what was in it. Appellant's father said he thought that clothes were in the bag, but could not "say for sure."

*Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983) (citations omitted). Even when evidence is admissible under *Toliver,* however, it may be excluded if its prejudicial effect substantially outweighs its probative value. *See Green v. United States,* 440 A.2d 1005, 1006–1007 (D.C.1982); *see also Johnson v. United States,* 683 A.2d 1087, 1098–1100 (D.C.1996) (en banc) (adopting "substantially outweighed" standard of FED.R.EVID. 403 as governing *Drew* issues in the District of Columbia courts).

Before trial, the government moved to admit, under *Toliver,* evidence of appellant's drug dealing and his sexual solicitation of Ms. Belton. After a hearing, the court granted the motion, ruling that the evidence was admissible because the other crimes occurred close in time to the murder and their relevance was not outweighed by the prejudicial effect. With regard to the sexual solicitation, the court held that the evidence was "highly relevant" because "both parties are going to need and intend to introduce a lot of the surrounding circumstances of the murder." The court also ruled that "on the scale of prejudice, it is almost a wash," because Ms. Belton and appellant were both participants; consequently, "to the extent that it prejudices the defendant, it equally prejudices the government witness." With regard to the drug dealing, the court said, "It certainly seems to me that the relevance of that and the need for that, to explain the circumstances very immediately surrounding the murder, are even greater."

Appellant argues that the court erred because his criminal behavior was not admissible under *Toliver.* We disagree. Appellant's actions were close enough in

time and sufficiently intertwined with the murder of Mr. Tyson to fall within the *Toliver* principle. Both the drug dealing and the solicitation of sex for $8.00 [6] took place only a few hours before Mr. Tyson was killed. *Cf. Rindgo v. United States,* 411 A.2d 373, 376–377 (D.C.1980) (rejecting claim that evidence of other robberies which occurred a week or more before the crime at issue did not provide relevant background information about the defendant's relationship with others involved in the crime). Furthermore, the activities were sufficiently connected with the events leading up to the murder so as to permit the government to present the full story of how the crime occurred. *See Old Chief v. United States,* 519 U.S. 172, 189, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Bell v. United States,* 677 A.2d 1044, 1047–1048 (D.C. 1996).

Appellant argues, in the alternative, that even if the evidence was admissible under *Toliver,* it was more prejudicial than probative and should therefore have been excluded. The trial court ruled otherwise, however, and we cannot say that its ruling was erroneous. Without the evidence of appellant's drug dealing, the government would not have been able to explain the events leading up to the murder, including why appellant came to Ms. Belton's home, why Mr. Tyson gave appellant a ride, where Mr. Tyson and appellant were heading at that hour of the morning, and what Mr. Andrews thought appellant was doing when he got out of the car at Rhode Island Avenue and First Street. Although allowing the jury to hear evidence of appellant's drug activity undoubtedly resulted in some prejudice, the trial court could, and did, reasonably conclude

**6.** D.C.Code § 22–2701 (2001) makes it a crime to "address ... any person ... for the purpose of prostitution or any other immoral or lewd purpose." "Prostitution" is defined

as engaging in sexual acts or contacts with another person "in return for a fee." D.C.Code § 22–2701.01 (2001).

that the prejudice did not outweigh the significant probative value of the drug evidence. *See Boone v. United States,* 769 A.2d 811, 817 (D.C.2001).

■■■ Although the solicitation of prostitution is a closer call, we are satisfied that the trial court did not err in admitting the challenged evidence. It is worth noting, first of all, that although the act of soliciting sex in return for money is a crime, prostitution itself is not. *See Ford v. United States,* 533 A.2d 617, 626 (D.C. 1987) (en banc). Furthermore, the record in this case is not clear as to who did the soliciting. If Ms. Belton was the solicitor, then appellant committed no crime, and *Drew* and *Toliver* are both inapposite. Even if appellant did the soliciting, however, we cannot say that the court abused its discretion in admitting the evidence. Although the case could probably have been tried without reference to the sexual solicitation, it was clear that both sides intended to delve deeply into the circumstances surrounding the murder, which made the evidence plainly relevant. For that reason the court ruled that the evidence was admissible. We cannot find fault with the court's reasoning, and hence we hold that there was no reversible error.

### B. The "Lie Detector Test"

During cross-examination, while being questioned about his plea agreement with the government, Mr. Andrews mentioned that he had taken a "lie detector test." The pertinent portion of the transcript reads as follows:

Q. [by defense counsel]: When it says right there in your plea agreement that they're only releasing you for investigative purposes. Doesn't it say that? But after you signed that plea agreement, you didn't help them in any investigations at all, did you?

Ms. ANDERSON [the prosecutor]: Objection.

\* \* \* \* \*

THE COURT: ... You may answer that.

A. Only thing I know they did as far as they brung me—only thing they did is brung me to take a lie detector test, and that's about it.

Defense counsel, after an interval, moved for a mistrial, arguing that the disclosure of the lie detector test was inappropriate and that the jury could guess the results by implication because the government would not rely on Mr. Andrews as a witness if he had failed the test. The court denied the motion, but offered to instruct the jury not to speculate about the results of the test. Defense counsel rejected an immediate instruction because "it would simply serve to highlight things," but asked the court to give an instruction at the end of the trial "in the midst of the other instructions." The court agreed and later gave the following instruction, which was proposed by defense counsel, as part of its charge to the jury:

The results of polygraphs are not admissible in evidence in a trial because they are unreliable. Do not let the topic come up in your thinking or in your discussions.

■■■ In *Peyton v. United States,* 709 A.2d 65 (D.C.), *cert. denied,* 525 U.S. 854, 119 S.Ct. 134, 142 L.Ed.2d 108 (1998), this court adopted a multi-factor test for determining whether a reference to a polygraph test is so prejudicial as to result in the denial of a fair trial. The factors are: (1) whether the reference to a lie detector was repeated or whether it was a single, isolated statement; (2) whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; (3) whether the witness making the reference is the principal witness upon whom the entire prosecution de-

pends; (4) whether credibility is a crucial issue; (5) whether a great deal of other evidence exists; and (6) whether an inference as to the result of the test can be drawn.... No single factor is determinative in any case.

*Id.* at 70 (quoting *Guesfeird v. State*, 300 Md. 653, 659, 480 A.2d 800, 803 (1984)). In a close case, the outcome may depend on "the efficacy of the trial judge's remedial instruction," but "the overwhelming weight of authority in cases involving the disclosure that a witness took a polygraph test supports the position that an effective instruction by the judge is sufficient to avoid a mistrial." *Peyton*, 709 A.2d at 72 (citations omitted). In *Peyton* itself this court held that, although the case was close, the trial judge's admonition to the jury to ignore the reference was sufficient to cure any prejudice. *Id.*[7]

In this case, as in *Peyton*, the factors "do not all tilt in the same direction," which makes it especially important to determine whether the trial judge took "effective counter-measures." *Peyton*, 709 A.2d at 72. On the one hand, the mention of the polygraph test was only an isolated event in a lengthy cross-examination, and the government had a strong case that included other evidence. On the other hand, although the mention of the test was apparently inadvertent, Mr. Andrews was an essential government witness, and his credibility was important. The final *Pey-*

*ton* factor, whether the jury could have drawn any inference as to the result of the test, is of uncertain weight but in all likelihood is slightly favorable to appellant. The jurors were never given any hint about the outcome of the test, but they could rationally have inferred a favorable outcome because the government probably would not have called Mr. Andrews as a witness if he had failed.

The jury instruction in this case was shorter and somewhat less forceful than the instruction in *Peyton*, and it was also given at the end of the trial rather than immediately after the witness' testimony. This delay, however, was entirely due to defense counsel's specific request that the judge not give an immediate instruction after he had offered to do so. Moreover, the actual language of the instruction given here was crafted by defense counsel and contained a stern warning to the jurors, directing them not to "let the topic come up in your thinking or in your discussions." Because defense counsel wrote this instruction and because we must presume that the jury followed it, *see Peyton*, 709 A.2d at 72, we cannot say that it was insufficient to cure any prejudice. Overall, we conclude that *Peyton* and this case are close enough on their facts to make *Peyton* dispositive on this point.

## III

After noting an appeal from his conviction, appellant filed a motion to vacate his

---

7. The trial judge gave the following instruction in *Peyton:*

> In this jurisdiction, polygraph tests are not admissible evidence because the science hasn't developed enough to be sufficiently sound to be reliable evidence. Not only that, but we don't know—you certainly don't know the results of any polygraph test, and not only that, but you don't know what questions were asked to lead to those results.
>
> So when I ask you to strike [the reference to the polygraph test], I mean for you to do

> that, and what I mean by that is to make certain that whatever your verdict is in the case, it never makes any reference whatsoever to the comment about a polygraph test.
>
> The last thing I want to tell you is, because it isn't admissible evidence or competent evidence, nobody else is going to be permitted, neither defense counsel nor the government counsel, to discuss that any further. So let's disregard it and move on.

*Peyton*, 709 A.2d at 68.

sentence under D.C.Code § 23–110, arguing among other things that his trial counsel was ineffective because he failed to notify the court about a sleeping juror. Appellant submitted an affidavit stating that he noticed one juror sleeping on several occasions, that he pointed it out to his counsel, and that counsel said he would look into the matter but never notified the court. At the hearing on the motion, appellant and his brother both testified about the sleeping juror. Appellant stated that he saw three jurors sleeping and that one of them was sleeping during the testimony of Antwone Andrews. He said that he notified his counsel, but that counsel did nothing about the matter. Appellant was impeached with his affidavit in which he had stated that only one juror was sleeping. Appellant's brother said that he saw two jurors who appeared to be sleeping during the second week of the trial (Andrews testified during the first week) for a period of about three to five minutes.

The government presented the testimony of appellant's trial counsel, who recalled that appellant had notified him on one occasion that one of the jurors was sleeping, and that he watched that juror from then on but did not see him asleep thereafter.

The trial judge found that only one juror was sleeping, and that "there was an appearance that a juror was sleeping perhaps on one occasion and maybe for a period of minutes." Although the judge said it was a "close question" as to whether defense counsel should have brought the matter to his attention, he ruled that there was no ineffective assistance of counsel because appellant had not shown any prejudice.

To establish that counsel was constitutionally ineffective, appellant must show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense in such a way as to undermine confidence in the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We hold that appellant's claim of ineffective assistance does not pass the *Strickland* test.

In this case the court found that at least one juror was sleeping, but it is unclear whether defense counsel knew this at the time. Counsel testified only that appellant told him a juror was sleeping and that he watched but did not see the juror asleep during the remainder of the trial. Counsel's memory about the incident was not very strong, but he did say that he would have told appellant to let him know if he saw a juror asleep, and appellant never did. On this record, and in light of relevant case law about "juror inattentiveness," we would be hard-pressed to find counsel's performance deficient. *See Golsun v. United States*, 592 A.2d 1054, 1057 (D.C.1991).

But even if counsel was aware that the juror was sleeping and did have a duty to report it to the court, we are not persuaded that his failure to do so in this instance resulted in any meaningful prejudice to the defense. The court found that only one juror was sleeping, and only for three to five minutes at the most. Given that finding, it cannot be said that the sleeping juror "missed large portions of the trial or that the portions missed were particularly critical." *United States v. Freitag*, 230 F.3d 1019, 1023–1024 (7th Cir. 2000). Appellant claims, however, that the juror was asleep during the key testimony of Antwone Andrews. But the court made no such finding, and in any event, a few minutes of inattention over almost an entire day of testimony by Mr. Andrews would not necessarily prejudice the defense to the extent required by *Strickland*. *See United States v. Barrett*, 703 F.2d 1076, 1083 n. 13 (9th Cir.1983). Even if

counsel had brought the sleeping juror to the court's attention, it is unlikely that the trial would have turned out differently. As the government points out in its brief, the "chances are slim" that a juror who dozed off for no more than five minutes would have missed testimony so vitally important that failing to hear it not only would have swayed the juror's decision but enabled that juror also to sway the decisions of the other eleven jurors who found appellant guilty. Such an outcome can charitably be described as fanciful at best.[8]

## IV

We hold that appellant's trial was not unfairly prejudiced by the admission of other crimes evidence or by Mr. Andrews'

brief reference to a "lie detector test." We further hold that the failure of appellant's trial counsel to inform the court of a sleeping juror did not amount to ineffective assistance. Accordingly, the judgment of conviction and the order denying the motion under D.C.Code § 23–110 are both affirmed on the merits. The case is remanded for resentencing; see note 1, *supra.*

*So ordered.*

---

**8.** In so holding under the principles of *Strickland,* however, we emphasize that a fair trial presupposes careful attention by the jurors to all of the testimony, and that both the court and counsel must do all in their power to ensure that jurors do not in fact sleep through any part of the proceedings.