Oliver J. HAIRSTON, Appellant

v.

UNITED STATES, Appellee.

No. 00–CF–1661.

District of Columbia Court of Appeals.

Argued March 18, 2003.

Decided Oct. 12, 2006.

Karen Pita Loor, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Denise M. Clark, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the

time the brief was filed, and Roy W. McLeese, III, and Anthony Asunción, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, Associate Judge, and STEADMAN and TERRY, Senior Judges.*

PER CURIAM:[1]

Appellant was indicted for armed robbery, assault with a dangerous weapon (ADW), and carrying a dangerous weapon ("an unknown sharp object"). A jury found him guilty on the latter two charges, but was unable to reach a unanimous verdict on the armed robbery count, which was later dismissed by the government. On appeal, appellant challenges only his conviction of assault with a dangerous weapon,[2] maintaining that the trial court committed reversible error by giving the jury an aiding and abetting instruction. We hold that, because there was no evidence before the jury admitted for its truth that allowed the jury to find that appellant was an accomplice to the crime rather than the principal offender, it was error to give the aiding and abetting instruction. Furthermore, because the government did not argue harmless error in its brief to this court (or, for that matter, more than glancingly at oral argument in response to questions by the court), it has waived that point since any harmlessness is not "obvious." *Randolph v. United States,* 882 A.2d 210, 223 (D.C.2005). We therefore reverse the ADW conviction and remand for a new trial on that count.

I

In the early morning hours of May 17, 2000, shortly after midnight, Keith Byrd was on the way home to his apartment on W Street, N.W. He had been at a party earlier that evening where he had consumed a six-pack of beer over several hours, so he decided that he needed to stop and get something to eat before returning home. As he approached a convenience store near his apartment, he was confronted by appellant, whom he had known for about nineteen years. Appellant asked for a cigarette, and Byrd replied that he did not have one. After this brief conversation, Byrd decided to go instead to a nearby carryout restaurant and buy something that was already prepared so that he would not have to cook it when he got home.

Byrd then noticed that appellant and another man were following him. Feeling uncomfortable about them, Byrd changed direction again and headed straight for his apartment. As Byrd pressed the buzzer to be admitted into his apartment building, appellant appeared on the steps. When the door was opened and Byrd entered the lobby, appellant followed him inside while the other man remained across the street. Once they were a few steps inside the apartment hallway, appellant began making vague accusatory comments about "what you're doing," but Byrd ignored the comments because appellant "was too gazed up." The next thing Byrd remembered was being struck in the face with a sharp object[3] that caused his mouth to

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

　Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. This opinion was written partly by Judge Farrell and partly by Judge Terry.

2. The court imposed concurrent sentences on the two convictions.

3. Byrd described this object as "a little metal stick."

bleed. A struggle ensued in which appellant tried to reach inside Byrd's pockets and take his money. Byrd resisted, but during the struggle appellant managed to rip Byrd's pants and take the cash (a total of $71) that was in his pockets. While this was going on, the unidentified man who had been with appellant earlier came to the door, but Byrd testified that he was unable to enter the building because the door had closed and locked after appellant and Byrd had come inside. Appellant then left, remarking as he went, "Yeah, I got you, like that."

Byrd then passed out for about five minutes but was awakened by another tenant in the building who found him lying in the hallway. He then headed upstairs to the apartment that he shared with his brother, Ronnie Jones, and his brother's fiancée, Rosemary Bush. His brother greeted him at the door. When Jones and Bush asked what had happened to him, Byrd replied that he had just been robbed by appellant, whom he identified by his nickname "Tolu." A few minutes later, Byrd called the police. Sergeant Andre Taggart was the first responding officer, and when he arrived, Byrd told him that he had been robbed by Tolu and another man.[4] Byrd went to the hospital later that night for treatment of his facial wound.

Byrd was thoroughly cross-examined by defense counsel. In his questioning, counsel highlighted the fact that Byrd currently had a matter pending in the Superior Court arising from his arrest for possession of cocaine with intent to distribute it. Defense counsel also established that Byrd had violated a condition of his release by

being in the neighborhood where the incident took place. Byrd acknowledged that three days after the assault in this case he had pleaded guilty to a charge of attempted distribution of cocaine and had been placed in a drug rehabilitation program. Furthermore, Byrd admitted that on the night of the assault, in addition to consuming alcohol, he had smoked crack cocaine.[5] Finally, Byrd said that appellant came into the front hallway of his apartment building and robbed him alone, but that appellant and the other unidentified man had been together beforehand.

The government presented testimony from four other witnesses,[6] all of whom corroborated Byrd's implication of appellant in the assault. At the same time, however, they recounted earlier statements by Byrd to the effect that a second person—presumably the unidentified man who Byrd testified had come to the door of the apartment building but never entered it—had participated in the assault by either cutting Byrd or taking money from his pocket. Upon defense counsel's request, the trial court instructed the jury that these prior statements of Byrd, because they were "inconsistent" with his trial testimony, could not be considered for their truth but only in evaluating his credibility.

Appellant did not testify or put on any witnesses in his defense.

At the close of all the evidence, after instructing the jury on the offense of assault with a dangerous weapon, the trial court—over defense objection—gave an in-

---

4. Taggart also confirmed that there was a cut on Byrd's face and that Byrd said the second man—not appellant—was the one who cut him.

5. He also admitted smoking marijuana earlier that day.

6. Those witnesses were Rosemary Bush, Ronnie Jones, Sergeant Taggart, and Detective Thomas Williams. Detective Williams, who interviewed Mr. Byrd several days after the assault, testified on cross-examination that Byrd told him he had been attacked by two men, and that the second man—not appellant—was responsible for his facial wound.

struction on aiding and abetting. The court said to the jury:

> Now, you may find the defendant guilty of the crime charged ... without finding that he personally committed each of the acts that make up the crime.... When a person who in the same way intentionally participates in the commission of the crime, aids and abets the principal offender, he therefore is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.
>
> To find that the defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the person who committed the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed. Some affirmative conduct by the defendant to help in planning or carrying out the crime is necessary.... It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted the principal offender in committing the crime.

## II

▆ Appellant argues that the trial court erred in giving the aiding and abetting instruction because no evidence admitted for substantive purposes allowed a reasonable inference that he was an accomplice who had assisted another (a principal) in commission of the crime. We agree.

▆ To obtain a conviction on a theory of aiding and abetting, the government must prove that "(a) a crime was committed by someone; (b) the accused assisted or participated in its commission; and (c) his participation was with guilty knowl-

edge." *Jefferson v. United States*, 463 A.2d 681, 683 (D.C.1983) (citation omitted). "While a defendant may be charged and convicted as the principal even though the proof is that he was only an aider and abettor ... there must be evidence that someone other than [the] defendant was the principal whom the defendant aided and abetted." *Payton v. United States*, 305 A.2d 512, 513 (D.C.1973) (citations omitted). "To be an aider and abettor, one must 'aid or abet or procure *someone else* to commit a substantive offense.... *One cannot aid or abet himself.*'" *Brooks v. United States*, 599 A.2d 1094, 1099 (D.C. 1991) (quoting *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir.1984) (emphasis added in *Brooks*)).

In *Brooks* we held that it was reversible error for the trial court to instruct the jury on aiding and abetting, because the government's evidence showed only that the defendant was the principal actor in the burglary of a restaurant. While there was some evidence that a second person might have been involved, that person could only have aided and abetted Brooks; "there was no evidentiary basis for an instruction predicated on the notion that Brooks was an aider and abettor and someone else the principal." 599 A.2d at 1098.

In this case there was evidence in the form of prior statements by the victim, Mr. Byrd, arguably casting appellant in the role of accomplice rather than principal. The government concedes, however (Br. for Appellee at 14), that all of those statements were governed by the court's limiting instruction that they had been admitted only for their relevance to assessing Byrd's credibility and could not be considered for their truth.[7] Moreover, Mr. Byrd, the only eyewitness to the assault, testified plainly in court that appellant alone had entered the hallway of the

---

7. Thus, whether any of the statements properly could have been admitted for substantive purposes as, say, excited utterances or statements of prior identification is not before us.

apartment building and robbed him—that the other, unidentified man who had been with appellant beforehand was unable to enter the building because the door had closed and locked after appellant and Byrd had come inside. In short, no evidence admissible for its truth (rather than for impeachment purposes) cast appellant in an incriminating role other than that of principal.

The government argues nevertheless that Byrd's prior statements, without transgressing the limiting instruction, contributed to an evidentiary basis for the aiding and abetting instruction. It asserts that the jury fairly could have used them to discredit part but not all of Byrd's testimony, namely, his insistence that appellant alone had assaulted him, while crediting his assertion that appellant had played *some* role in the assault. As the government says, for the jury to convict appellant as an aider and abettor, it "simply" had to: "(1) doubt Mr. Byrd's testimony [by employing his prior inconsistent statements] that appellant inflicted the wound at issue; (2) accept the ample evidence that a stabbing occurred; (3) accept Mr. Byrd's testimony as to other aspects of appellant's involvement in that stabbing; and (4) infer that an unidentified person therefore must have inflicted the wound at issue, and that appellant's conduct aided and abetted that person." (Br. for Appellee at 15 n. 9).

The problem with this argument is that Byrd testified to no "aspects of appellant's involvement in [the] stabbing" other than his lone commission of the crime. In other words, while the impeachment of his testimony—through statements implying that he could not remember appellant's role accurately—might have created a reasonable doubt on the issue of whether appellant committed the assault and was the principal, it could not serve as evidence that there was a different principal whose existence was supported by no other, nonconjectural evidence. (The government correctly does not rely on the fact that, according to Byrd, the unknown man approached the building and tried unsuccessfully to enter.) As appellant states in his brief:

[I]n the universe of facts in the instant case, there is no evidence that anyone besides Mr. Hairston and the complainant was even present in the building lobby when the [assault] occurred, much less that anyone else acted as a principal. If there was a reasonable doubt as to whether Mr. Hairston stabbed the complainant, [then *Brooks* and *Payton, supra,* teach that] the jury was not free to speculate that someone else stabbed him because there was no evidence of anyone else's existence in the microcosm of facts in this case.

In its brief to this court, the government has made no argument disputing appellant's contention (in his opening brief) that if the aiding and abetting instruction was improper on this record, then he was prejudiced by the giving of it. Nor, beyond a bare assertion in response to a question from the court, did it seek to explain at oral argument why the instruction was harmless error. Appellant points out that in closing argument the prosecutor sought to exploit the instruction by telling the jury that because of "the concept of aiding and abetting," it was the jury's duty to convict as long as it concluded "that the act occurred ... [and] that [appellant] participated" in the act, even if it did not believe that he stabbed or cut Byrd; and stating further that "it doesn't really matter whether you conclude he's the one who stabbed him in the face."

In these circumstances, we exercise our discretion not to undertake a harmless error analysis which the government has not advanced. *See Randolph,* 882 A.2d at 223 ("[W]here, as here, the government has

failed to claim in timely fashion that erroneous admission of hearsay evidence was harmless in the traditional sense, we should apply the harmless error doctrine only when harmlessness is obvious."). Although, in a case such as this, an argument could be made that a jury will likely disregard a factually unsupported theory of liability—here accomplice liability—in favor of one clearly supported by the evidence, *see Griffin v. United States,* 502 U.S. 46, 59–60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991),[8] we do not pursue that argument when the government has declined to make it and when appellant has thus been unable to contest it by counter-argument.

In sum, on the authority of our decisions in *Brooks* and *Payton,* we reverse appellant's conviction of assault with a dangerous weapon and remand the case for a new trial on that charge. We affirm his conviction of carrying a dangerous weapon.

*Affirmed in part, reversed in part.*

---

8. The Supreme Court said in *Griffin:*

It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.

*Griffin,* 502 U.S. at 59–60, 112 S.Ct. 466 (quoting *United States v. Townsend,* 924 F.2d 1385, 1414 (7th Cir.1991)).