Maurice TYREE, Appellant

v.

UNITED STATES, Appellee.

No. 03–CF–855.

District of Columbia Court of Appeals.

Argued Jan. 11, 2006.

Decided Feb. 14, 2008.

Deborah A. Persico, for appellant.

Amanda Williams, Assistant United States Attorney with whom, Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, Daniel P. Butler, and James G. McGovern, Assistant United States Attorneys, were on the brief for appellee.

Before WASHINGTON, Chief Judge, RUIZ, Associate Judge, and FERREN, Senior Judge.

RUIZ, Associate Judge:

Appellant appeals his conviction of first-degree premeditated murder and various weapons offenses for the shooting death of Devon Taylor. Appellant challenges the aiding and abetting instruction given to the jury, the admission of other crimes evidence, the court's failure to instruct the jury on the defense theory of the case, and the trial court's denial of appellant's motion for a mistrial due to improper comments during the prosecutor's closing argument. We affirm.

I.

At trial, the government presented evidence that on February 7, 2000, appellant

and Alvin Narce (who was tried separately), shot and killed Devon Taylor inside their friend Jermaine Gregory's second-floor apartment, located at 233 Florida Avenue, N.W. At the time of the murder, the three men were involved in a violent dispute with a group of young men, known as "LDP," from the Ledroit Park neighborhood. The dispute stemmed from the 1997 murder of an LDP member. The murder victim in this case, Devon Taylor, and his friend, Sean Walker, were alleged to have been involved in the 1997 murder.

Throughout the spring and summer of 1999, LDP members initiated a series of retaliatory attacks upon Jermaine Gregory, Alvin Narce, and others known to associate with Taylor. The timing of the attacks coincided with Taylor's release from custody after the 1997 murder charge was dropped. Associates of Taylor were attacked on several occasions, including one that resulted in a leg injury to Gregory that left him unable to walk without the assistance of a crutch, and, with the exception of trips to the doctor, kept him homebound. As a result, Gregory began running his drug operations out of his apartment, with frequent visits from friends and associates, including Narce and appellant.

Gregory testified that he kept several weapons in his apartment, including a "Tech 9" in his bedroom closet, and an inoperable "AR15" assault rifle in the common area. Gregory allowed appellant to keep a twelve-gauge shotgun in the closet; Narce also occasionally kept a 9mm. Smith and Wesson semi-automatic pistol at Gregory's apartment. According to Gregory, although he and Taylor remained friends after the LDP shootings, Narce and appellant objected to Taylor's "coming around" to Gregory's apartment.

On February 7, Taylor called Gregory and asked if he could come over with his friend Chris Handon later in the day. When Gregory told Narce that Taylor would be arriving, Narce said, "Good. We can get this shit—we can talk about this shit what's going on." Gregory understood Narce to be referring to their problems with the LDP group. Sometime after 6:00 p.m., a group had gathered at Gregory's apartment, including appellant, Narce, Robert Wilson, William Sutherland, Nathaniel Smith, Daniel Bailey, Taylor, and Handon. Gregory testified that Daniel Bailey had come to buy crack from appellant. Everyone seemed to be getting along for a while, but at some point, Narce and Taylor became involved in a verbal dispute, which began when Narce confronted Taylor about when he was going to do something about LDP's attacks. Taylor responded that he would act when he got a "better gun." The two argued back and forth for a while, and the confrontation escalated. Gregory told Taylor to leave before something happened, and Taylor asked Narce if he could speak to him "outside." The two spoke outside the apartment for five to ten minutes, and when they returned, it seemed as if "everything had died down." While they were outside, Handon remarked that it was going to take Taylor being shot before he would do something, and appellant responded, "no bullshit." Tensions rose again once Taylor began to recount his conversation with Narce to Handon, causing Narce to say "it's stamped," which meant, according to Gregory, that Narce had decided to kill Taylor.

Taylor told Handon that he wanted to leave, and as they got up to do so, Narce said he would let them out. With his 9 mm. in hand, and the hammer already cocked back, Narce followed Taylor and Handon downstairs to the front door of the apartment building. Gregory testified that as the men headed down the stairs,

appellant went to the closet to retrieve his shotgun and then, with shotgun in hand, followed Narce, Taylor, and Handon down the steps. When appellant reached the bottom of the steps, he said, referring to Narce, "if my dog rolling, I'm rolling." Appellant pointed his shotgun toward Handon and Taylor. The other men in Gregory's apartment stood at the top of the stairs to watch what would happen. Narce let Handon out the door, then locked it so that Taylor could not leave. Then Narce and Taylor began "tussling" with Narce's gun, and the gun went off, firing into the ceiling. Taylor ran back up the stairs, followed by Narce and appellant. Gregory headed to his bedroom, and Taylor followed him. When Gregory left the bedroom because he did not want to be shot, Taylor followed him into the living room. Narce had stayed behind Taylor with his gun pointed at Taylor, and appellant was in the living room with his shotgun. Narce began firing a series of 15–16 shots from his pistol, hitting Taylor in the legs three times, taking him down to the floor. Appellant then fired two shotgun blasts, at close range, hitting Taylor in the back. Gregory heard the blasts, turned around and saw Taylor collapsing on the floor, as appellant and Narce stood in front of Taylor with their guns.

Gregory got his Tech 9 out of the closet, put it in a laundry bag and gave it to Nathaniel Smith, along with several thousand dollars, to take the gun out of the apartment. Appellant left the apartment with the shotgun. Narce left his gun on the floor and Gregory threw it out the window into the yard of his next door neighbor's house. The rest of the men ran out the back door toward the alley and left the area. Gregory then yelled out of his window to his landlady, who was attending her first-floor grocery store, and asked her to call the police.[1]

Two other witnesses, William Sutherland and Nathaniel Smith, testified that they saw appellant shoot Taylor with a shotgun. Another witness, Daniel Bailey, testified inconsistently about what he saw. He testified, first, that he did not see who shot Taylor; second, that when he was in the living room after the shootings, he saw appellant holding a shotgun; and finally, that he had left the apartment before the shootings.

The only defense witness, Robert Wilson, testified that he did not see who shot Taylor, but that, after the shooting, he saw William Sutherland with a shotgun in his hand. Wilson further testified that he did not see appellant with a shotgun at any time on February 7. Wilson also testified that three days after Taylor was shot, he went back to Gregory's neighborhood and heard people saying that "Meat done killed somebody." "Meat" was Gregory's nickname. A few days later, Wilson saw Sutherland and a man named Vance getting into an SUV, and he asked them to give him a ride home. Vance said he was about to take Sutherland to the Anacostia River, and Sutherland explained that he "got a body on the shotgun," and needed to get rid of the gun. Wilson understood that to mean that Sutherland had killed someone with the shotgun. Wilson did not go with them. Also, Wilson admitted that he did not tell the grand jury what he testified to at this trial and at Narce's trial, but ex-

---

1. Gregory remained in police custody after the murder, and was in the witness protection program at the time of appellant's trial. Gregory admitted on cross-examination that he had lied to the police, that he did not tell them he had a gun, and about the presence and identity of some of the men who were inside the apartment the night of the shootings, and that he also lied to the prosecutor. He also admitted that he had denied at another trial that he and appellant had previously discussed Taylor.

plained it was because he was scared of Sutherland, Gregory, and "a lot of those guys."

The Medical Examiner, Dr. Marie–Lydie Pierre–Louis, testified that Taylor had three gunshot wounds to the leg and knee and two shotgun wounds to the back. The autopsy found that Taylor died as a result of the two shotgun blasts to his back.

## II.

### A. *Aiding and Abetting Instruction*

Appellant claims that the trial court erred in giving an aiding and abetting instruction because the government proceeded against appellant during trial as the principal perpetrator of the murder, introducing evidence that it was appellant who fired the shotgun blast that killed Devon Taylor. For the reasons that follow, we agree that the aiding and abetting instruction should not have been given in this case, but conclude that the error was harmless.

■■■■ "By its terms, ... the first-degree murder statute imposes felony murder liability solely on the person who does the killing. Other participants in the felony are exposed to first-degree murder liability only by virtue of the aiding and abetting statute." *Christian v. United States*, 394 A.2d 1, 48 (D.C.1978) (citation omitted).[2] The aiding and abetting statute provides that "all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals...." D.C.Code

---

2. The first-degree murder statute punishes "[w]hoever, being of sound memory and discretion, kills another purposely...." D.C.Code § 22–2101 (2001). This is not to say that there may not be situations where two (or more) participants could be charged as principals. *See* generally 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 13.1(a) at 328–29 (2d ed. 2003). One such situation is if there is evidence that each actor was a causative factor in the offense. *See State v. Keene*, 81 Ohio St.3d 646, 655, 693 N.E.2d 246, 256 (1998) (noting that [t]here can be more than one actual killer—and thus more than one principal offender—and holding that defendant was properly convicted as principal in a case where coroner testified that victim "died of multiple gunshot wounds and that [defendant's] shot to [victim's] heart would by itself have killed" the victim, even if another "finished him off"); *cf. Stack v. United States*, 519 A.2d 147, 154–56 (D.C.1986) (holding it was error not to instruct jury on independent cause of death that would have exonerated defendant of murder). In this case, the expert testimony established that it was only the shotgun blasts that were lethal, so Narce could not have been a principal in Taylor's killing.

Moreover, two or more persons can also be charged of the same killing as principals on a conspiracy theory. *See Hazel v. United States*,

353 A.2d 280, 283 (D.C.1976) (noting that aiding and abetting statute "did not alter the common law with respect to the legal responsibility of joint principals for each other's acts"). Although they may both apply to the same facts, *see United States v. Sampol*, 204 U.S.App. D.C. 349, 403, 636 F.2d 621, 675 (1980) (in murder of former Chilean ambassador, defendants could be charged both as co-conspirators and aiders and abettors), aider and abettor liability and conspiracy liability are "distinct legal theories that require proof of different elements." *Wilson–Bey*, 903 A.2d at 839. To establish liability based on a conspiracy, the government must prove the existence of an agreement, a substantive crime committed by a co-conspirator in furtherance of the agreement, and that the crime was a reasonably foreseeable consequence of the agreement between the conspirators. *See id.* at 840 (citing *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). "The government is not, however, required to establish that the co-conspirator actually aided the perpetrator in the commission of the substantive crime, but only that the crime was committed in furtherance of the conspiracy." *Wilson–Bey*, 903 A.2d at 840; *see also* D.C.Code § 22–1805a (2001) (establishing separate offense of conspiracy to commit crime). In appellant's case, the jury was instructed on aider and abettor liability, not conspiracy.

§ 22–1805 (2001). A necessary premise for aiding and abetting liability is the commission of the underlying offense. *See In re J.W.Y.*, 363 A.2d 674, 677 (D.C.1976).[3] To prove aiding and abetting, the government must show that "(a) a crime was committed by someone; (b) the accused assisted or participated in its commission; and (c) his participation was with guilty knowledge." *(Larry D.) Hawthorne v. United States*, 829 A.2d 948, 952 (D.C. 2003) (quoting *Edwards v. United States*, 767 A.2d 241, 251 (D.C.2001)). In law, the aider and abettor is equally as culpable as the principal. *See* D.C.Code 22–1805 (2001); *Byrd v. United States*, 364 A.2d 1215, 1219 (D.C.1976). Therefore, we have said, to be found criminally liable for aiding and abetting an offense that has an element of specific intent, the aider and abettor must be proven to have the *mens rea* required for the offense, and the jury must be so instructed. *See Wilson–Bey v. United States*, 903 A.2d 818, 822 (D.C. 2006) (en banc) (first-degree premeditated murder); *Kitt v. United States*, 904 A.2d 348, 356 (D.C.2006) (unenumerated felony murder with element of specific intent).[4]

▮▮▮ Whether to give an aiding and abetting instruction is a matter within the discretion of the trial court, provided there is evidence sufficient to support a finding of guilt on this theory. *See, e.g., (Larry D.) Hawthorne*, 829 A.2d at 952; *Edwards*, 767 A.2d at 251. That means, at a minimum, that there must be evidence to support that someone else acted as a principal, as "[o]ne cannot aid or abet himself." *Brooks v. United States*, 599 A.2d 1094, 1099 (D.C.1991) (quoting *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984)). It is not enough that two or more persons acted in concert; there must be a principal actor, even though not specifically identified, but the prosecution must establish that "someone ha[s] that status." *Gayden v. United States*, 584 A.2d 578, 582 (D.C.1990) (quoting *United States v. Staten*, 189 U.S.App. D.C. 100, 108, 581 F.2d 878, 887 (1978) (interpreting federal aiding and abetting statute, 18 U.S.C. § 2(a))).[5] Otherwise, there is a risk that the jury might convict without the necessary preliminary finding that a "crime was committed by someone," who was assisted by the defendant. Noting that "there must be evidence that someone other than the defendant was the principal whom the defendant aided and abetted," we reversed a conviction based on aiding and abetting liability where there was no evidence of "the 'somebody' whom the prosecutor believed had committed the [crime, in that case, forgery] and [whom] appellant had

---

**3.** It is not necessary, however, to prove that the principal actor was convicted of the offense, *see Gray v. United States*, 104 U.S.App. D.C. 153, 154, 260 F.2d 483, 484 (1958), and the aider and the abettor may be convicted even if the principal is acquitted of the offense, *see United States v. Edmond*, 288 U.S.App.D.C. 17, 23, 924 F.2d 261, 267 (1991).

**4.** This case was briefed and argued before we issued our opinion in *Wilson–Bey*. We note that the aiding and abetting instruction given by the trial court here contained the language in the then-current Redbook, No. 4.02, that we concluded contains an erroneous statement of the law ("It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed, or that he had intended to commit the particular crime committed by the principal offender. An aider and abetter is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participated."). *See Wilson–Bey*, 903 A.2d at 835–39.

**5.** We disagree with the government's contention, made in its brief and pressed at oral argument, that "evidence that appellant acted in concert with Narce during the murder," was a sufficient basis for the aiding and abetting instruction.

aided...." *Payton v. United States,* 305 A.2d 512, 513 (D.C.1973) (per curiam); *cf.* (*Larry D.*) *Hawthorne,* 829 A.2d at 953 (explaining that aiding and abetting instruction not plain error where there was "some evidence that someone other than defendant was the principal whom the defendant aided and abetted") (citations and quotation marks omitted); *Edwards v. United States,* 767 A.2d 241, 251 (D.C. 2001) (noting evidence that "someone else"—defendant's wife—committed the act that constituted the crime). This is not to say that a prosecution may not proceed on both theories—principal and aider and abettor—against the same defendant or that the jury may not convict of aiding and abetting in cases where the evidence is disputed as to who, as between the defendant and someone else, was the principal, so long as there is evidence that the defendant participated—in one capacity or the other—in the events that led to commission of the crime. Thus, in *Head v. United States,* 451 A.2d 615, 626 (D.C.1982), the court affirmed the conviction and approved the trial court's instruction on aiding and abetting liability where the evidence showed that the defendant participated along with two others in robbery and murder, but it was unclear who, of the three men, was the principal and who the abettors, in each of the crimes. *See Christian,* 394 A.2d at 48 n. 120 (noting that "government was unable to prove which of defendants were principals. It cannot be seriously disputed, however, that at least one of the defendants acted as a principal in the first-degree in killing the victims."). But to convict for aiding and abetting, the

logic is inescapable that there must be another person who acted as the principal.

■ This case presents the situation where the government proceeds against the defendant as a principal, and persuades the judge to give an aiding and abetting instruction, but there is little—if any—evidence to support that someone other than appellant was the principal. The evidence established that it was Narce who instigated the series of events that ultimately led to Taylor's death, and that appellant went along, to assist Narce ("If my dog rolling, I'm rolling"), only after Narce got into an argument with Taylor and announced that he intended to kill him ("It's stamped"). The two acted in concert from that moment and, in that sense, one might say in common parlance that appellant aided Narce in his plan. Witnesses testified that Narce fired several shots at Taylor, three of which hit him in the legs and brought him to the ground, after which appellant shot him twice, in the back, with his shotgun. But the medical evidence established that the leg wounds were not fatal and that it was the shotgun blasts to the back that killed Taylor. Therefore, if the jury believed that appellant fired the shotgun, then appellant had to have been the killer and liable for murder as a principal. This was the government's theory of the case. As there was no evidence supporting that Narce fired the shotgun that killed Taylor, even though appellant went along with Narce's plan, he cannot have aided and abetted Taylor's murder because Narce was not, as the government concedes, the principal in Taylor's murder.[6] Because an aiding and

6. At oral argument, the court asked government counsel whether Narce, who was also convicted of Taylor's murder at a separate trial, was convicted as a principal or as an aider and abettor. Government counsel, however, did not know the basis on which Narce was prosecuted. Assuming that the

government had the same evidence at both trials, due process concerns could be implicated if both Narce and Tyree were prosecuted as principals, or as aiders and abettors. *See Boyd v. United States,* 908 A.2d 39, 51 (D.C.2006). Narce's volley of shots that wounded Taylor and brought him to the floor

abetting instruction must be supported by evidence that the purported aider assisted someone who was the principal in committing the charged crime in this case, there was no factual underpinning for an essential element of aiding and abetting liability. Depending on whether the jury believed the government's theory of the case, appellant "was either the principal or a nonparticipant" in the murder. *Brooks,* 599 A.2d at 1100. Therefore, the aiding and abetting instruction should not have been given.[7] *See Hairston v. United States,* 908 A.2d 1195, 1199 (D.C.2006) (holding aiding and abetting instruction improper because "no evidence ... cast appellant in an incriminating role other than that of principal").

We therefore turn to determine whether the instruction prejudiced appellant, requiring reversal of his conviction and remand for a new trial. Generally, to conclude that the instructional error in a case is harmless, we must be satisfied "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see Tyler v. United States,* 495 A.2d 1180, 1183 (D.C.1985) (applying harmless error analysis to instructional error). Thus, "where the government proceeds against a defendant as a principal and at the close of the evidence successfully requests an aiding and abetting instruction, reversal may be required where the evidence of a principal is vague."[8] *Head,* 451 A.2d at 626. But where the content of the aiding and abetting instruction given was itself erroneous because it eliminated the *mens rea* requirement of first-degree premeditated murder, as we have noted is the case here, see note 2, *supra,* we apply the heightened standard applicable to constitutional error, which requires reversal unless the error is "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We apply this most strict standard in this case, even though

---

could be interpreted as preparation for the *coup de grâce* shotgun blasts that appellant delivered, making Narce the person who aided and abetted appellant's murder of Taylor. *See Brooks,* 599 A.2d at 1097 (noting that on facts presented it was not Brooks but an accomplice, who was not a co-defendant in the case, who would have been the aider and abettor). After consulting the record in Narce's appeal (No. 01–CF–1338), which is currently pending, it appears that the government prosecuted Narce for murder solely as an aider and abettor, arguing that Tyree was the principal.

7. The evidence did support that appellant participated, along with Narce, in assaulting Taylor before he was murdered, but the only lesser offense presented to the jury was second-degree murder, not assault.

8. We have said, that "[o]n the other hand, if there is clear and convincing evidence that the defendant was present and participating in the crime, a trial court's instruction on aiding and abetting does not mislead the jury or require reversal." *See Head,* 451 A.2d at 626 (citing *Hackney v. United States,* 389 A.2d 1336, 1343–44 (D.C.1978)). In *Brooks* we questioned the validity of this statement and the rationale given for it—that where there is convincing evidence of a defendant's participation in a crime, the aiding and abetting instruction is not inconsistent with the prosecution's theory that the defendant was the principal since "the greater participation in the offense includes the lesser and the legal effect is the same"—and reaffirmed the essential requirement, previously established in *Payton,* that there must be some evidence that someone else acted as a principal in committing the crime before a defendant may be found liable as an aider and abettor. 599 A.2d at 1102 n. 19. Moreover, we stress that conviction as a principal or as an aider and abettor is based on different theories of liability and should not be confused with greater and lesser-included offenses.

the issue has not been raised by appellant, because we can conclude, beyond a reasonable doubt, that "[a]ny impartial trier of fact who credited the prosecution's evidence would, in our view, be bound to conclude that [appellant] intended to kill the decedent, tried to kill [him], and succeeded in doing so...." *Wilson–Bey*, 903 A.2d at 846–47 (footnote omitted).

As noted, the government's theory at trial was that appellant fired the shotgun blasts that killed Taylor. But based on the testimony of Robert Wilson, the defense argued at trial that it was William Sutherland who fired the shotgun and killed Taylor. Appellant's argument is that if the jury believed that Sutherland fired the shotgun, the jury may have been confused by the erroneous aiding and abetting instruction into convicting him as having aided and abetted Sutherland. The government conceded at oral argument that there was no evidence to support such a finding. The jury's confusion, appellant argues, may have been deepened in this case by the trial judge's failure to give an instruction on the theory of the defense (that Sutherland killed Taylor), which we discuss *infra*. We think that this jury confusion, though theoretically possible, was not at all likely in this case. It is undisputable that *someone* was the principal, the person who fired the shotgun and killed Taylor, and the government and the defense offered two completely different versions of who that person was: either

appellant fired the shotgun, or Sutherland did. There was no other possible principal. The jury had to believe either the government's witnesses (Jermaine Gregory, William Sutherland and Nathaniel Smith) who said they saw appellant—complicit with Narce after he announced he was going to kill Taylor—shoot Taylor with the shotgun, or the defense witness (Robert Wilson) who testified that Sutherland had the shotgun right after the shooting and disposed of it a few days later because he "got a body on the shotgun." There was no reasonable reading of the evidence which would have led the jury to convict appellant of having assisted Sutherland in killing Taylor. We will not assume that the jury engaged in a "bizarre reconstruction" of the evidence to fit the aiding and abetting instruction.[9] *See Brooks*, 599 A.2d at 1099. Given the prosecution's unequivocal position throughout presentation of the case to the jury, from opening statement to closing argument, that appellant fired the shotgun that killed Taylor, and the parties' closing arguments—which focused primarily on the credibility of the witnesses who gave such contrasting versions and did not discuss aider and abettor liability—we think that the likelihood of the type of prejudicial jury confusion appellant suggests is negligible in this case. *Cf. id.* at 1100–01 (noting that defense counsel did not have opportunity to rebut erroneous aiding and abetting theory during closing argument).

9. In granting the government's request to instruct the jury on aiding and abetting liability, the trial court noted that there was evidence that Narce had fired a round of shots at Taylor ("emptied his gun"), and reasoned that the government was "entitled to ... have the jury not sit there and be troubled by who shot—fired the fatal shot." There was no basis, however, for the jury to doubt which was the fatal shot as the medical examiner unequivocally testified that Taylor's death was caused by the shotgun wounds to the back.

This testimony was unchallenged. The prosecutor added, in support of the request for the aiding and abetting instruction, "that the jury may reasonably conclude that Mr. Narce enjoyed [sic] all the premeditation and deliberation to actually do this murder, and that the defendant would have been aiding and abetting in that murder one." Presciently, in light of our subsequent decision in *Wilson–Bey*, the trial court did not appear to have agreed, saying, "that gets a little bit obscure."

Accordingly, we conclude that instructing the jury on aiding and abetting liability, though error in having been given at all and in its content, was harmless beyond a reasonable doubt.

### B. *Instruction on Defense Theory*

Appellant argues that his conviction should be reversed because the trial court failed to instruct the jury on the defense's theory of the case. Appellant's trial counsel requested a jury instruction on the defense theory, that it was William Sutherland, not appellant, who shot Taylor in the back with a shotgun, and submitted a proposed jury instruction. However, when the time came for reviewing the trial court's proposed jury instructions, and the judge specifically asked defense counsel if he had any proposed changes, counsel did not object to the court's failure to include his proposed defense theory instruction. It was not until after closing arguments and after the court had instructed the jury and asked whether there were any objections, that defense counsel approached the bench and addressed his own oversight in not bringing to the court's attention his earlier request to instruct the jury on the defense theory. After reviewing the requested instruction, the court responded, "You are entitled to a defense theory of the case, but it has to be in a timely fashion. What you handed me was a closing argument." When defense counsel then attempted to explain the instruction, the court reiterated that although a defendant is "absolutely" entitled to an instruction on his defense theory, what counsel had given the court was a closing argument, not a proper defense theory instruction. The court refused to give the instruction proffered by counsel, noting that it would highlight the defense theory and put the government at a disadvantage. As a result, there was no instruction given on the defense's theory.

The failure to give an instruction embodying a defense theory that negates guilt of the crime charged, when properly requested and supported by the evidence, is reversible error. *See Gray v. United States,* 549 A.2d 347, 350–51 (D.C. 1988) (citing *Stack,* 519 A.2d at 154); *Salley v. United States,* 122 U.S.App. D.C. 359, 360, 353 F.2d 897, 898 (1965). However, the trial court is not required to "rehearse the evidence, especially where the effect would be . . . to give special emphasis to the defendant's testimony." *Stack,* 519 A.2d at 154 (citing *Montgomery v. United States,* 384 A.2d 655, 660 (D.C. 1978) (quoting *Laughlin v. United States,* 128 U.S.App. D.C. 27, 34, 385 F.2d 287, 294 (1967))).

Although the jury received no specific instruction on the defense theory, we conclude that the trial court did not abuse discretion in refusing to give appellant's proposed instruction because he suffered no prejudice. We note, first, that although counsel had previously requested the instruction, he failed to mention the trial court's failure to include his proposed instruction on the defense theory when, following closing arguments, the court reviewed with counsel the packet of instructions it intended to give. An objection made after closing arguments and final instructions have already been given, even if made before the jury retires to deliberate, may interfere with an orderly presentation to the jury, and potentially prejudice the other party. *See Shreeves v. United States,* 395 A.2d 774, 786 (D.C.1978) (noting that jury instruction requests should be submitted prior to closing arguments so that both counsel may have an opportunity to object to one or more of the instructions and frame their arguments accordingly); Super. Ct.Crim. R. 30 (amended Rule 30, post-*Shreeves,* permits judge to instruct

jury "before or after the arguments are completed or at both times," and disallows objections to jury instructions made after jury retires to deliberate).[10] But our conclusion that appellant was not prejudiced is based on our determination that the proposed instruction simply summarized the evidence that the defense claimed supported that William Sutherland, and not appellant, killed Devon Taylor, including noting the impeachment of the credibility of the government's witnesses and the inferences the defense would have the jury draw from the physical evidence presented.[11] Although the trial judge should give a timely-requested instruction that presents the defense's theory, the purpose of the judge's instruction is not to repeat and advocate for the defense theory, but to give balanced instructions on both parties' presentations and to convey to the jury that the defense's argument is recognized in law. The defense theory here, that another person was the killer (and that the government's witnesses who said appellant fired the shotgun were lying) is well understood to completely exonerate the defendant. As the trial court put it, "I don't think there is anything that's particularly subtle about your theory, it is that the witnesses are all lying, it is absolutely clear to the jury." *Cf. Stack*, 519 A.2d at 155 (defense theory proposed an independent cause of death other than defendant's actions). The trial court's instructions extensively explained that credibility was for the jurors to assess and offered guidance on the factors they could take into account in making that determination. Moreover, although counsel's closing argument is no substitute for the judge's guidance on the legal principles the jury is to apply in its deliberations, *id.* at 156, the points in the requested instruction were primarily factual and were made by defense counsel in closing argument. The prosecutor's detailed reply in his rebuttal, would have furthered flagged the issue for the jury as

**10.** Superior Court Criminal Rule 30 provides: At the close of the evidence or at such earlier time during the trial as the Court reasonably directs, any party may file written requests that the Court instruct the jury on the law as set forth in the requests. At the same time, copies of such requests shall be furnished to all parties. The Court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury. The Court may instruct the jury before or after the arguments are completed or at both times. No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

**11.** The proposed instruction read: It is Maurice Tyree's theory of the case that Mr. Tyree is not guilty of all of the charged offenses because he was not involved in Murder of Devin [sic] Taylor and he never possessed a firearm (shotgun) during a crime of violence or possessed a firearm or ammunition. That any identification of Mr. Tyree as a shooter is simply not credible, because any such witness had told inconsistent statements, lied under oath or has a motive or bias to curry favor with the government. That Devin Taylor was shot with a pistol by Alvin Narce (Skeet) and Jermaine Gregory (Meat) and that Devon Taylor was also shot with a shotgun by William Sutherland (Weed or Wee–Wee). This can be inferred from the events before the shooting such as Jermaine Gregory and Alvin Narce arguing with Devin Taylor. The physical evidence in that all of the bullet holes from the shooting of Devin Taylor, are consistent with having originated from the location of Jermaine Gregory's crutch. And from events after the shooting that Jermaine Gregory and William Sutherland disposed of the two murder weapons and other evidence.

one deserving its attention.[12] As the trial court noted, the requested instruction is "not going to tell [the jurors] anything that they don't already know, and no one is sitting there thinking that that is not your theory of the case." On this record, the judge did not abuse discretion in refusing to give the requested instruction.

### C. *Other Crimes Evidence*

Appellant claims that the trial court should not have admitted evidence of an uncharged crime—that appellant sold drugs to Daniel Bailey on the night of the shooting. The evidence was admitted to establish that he was not an "innocent bystander" but a drug dealer, like others at the house, which would have given him a motive to kill Taylor for failing to quell the dispute over drug turf with LDP. Appellant argues, as he did to the trial court when he moved to exclude the evidence, that it was unduly prejudicial in that it unnecessarily "highlight[ed] appellant's criminal propensity," and was not necessary due to the fact "there was already proof that appellant was a drug dealer and confidant of Gregory." The trial court's decision to admit evidence of other crimes is reviewed for abuse of discretion. *See German v. United States*, 525 A.2d 596, 607 (D.C.1987). This court has consistently recognized that evidence of uncharged crime is inadmissible to prove disposition to commit the crime charged, following *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964); *see Jones v. United States*, 477 A.2d 231, 237 (D.C.1984). It may be admitted, however, to show motive, so long as its probative value is not "substantially" outweighed by the prejudicial impact on the defendant. *(William) Johnson v. United States*, 683 A.2d 1087, 1090 (D.C.1996) (en banc).

The trial court found that the probative value of the evidence that appellant sold drugs to Bailey admitted in this case substantially outweighed its potentially prejudicial impact. Appellant has conceded as much, noting that there already was other "powerful" evidence—to which he did not object—indicating that appellant was a drug dealer.[13] Assuming that the evidence was introduced solely to establish motive, evidence of appellant's drug dealing that night might have been cumulative and ultimately unnecessary—but it also was ultimately harmless—because appellant's drug dealing had already been well established. We therefore conclude that there was no abuse of discretion.[14] *See Parker v. United States*, 751 A.2d 943, 944 (D.C.2000).

### D. *Prosecutor's Closing Argument*

Appellant's final assertion is that the prosecutor's closing argument improp-

---

**12.** Because the prosecutor addressed the defense's theory in rebuttal, we do not think that the government would have been unduly prejudiced in this case if the trial court had given an instruction on the defense theory after closing arguments.

**13.** For example, appellant did not object to testimony that he, Narce, Sullivan, and Gregory all "sold drugs together"; that Daniel Bailey would often go to Gregory's apartment seeking appellant to "get crack from him"; or that Narce worked for appellant selling drugs.

**14.** The government asserts that admission of the evidence should not be analyzed as *Drew*

evidence, because it was direct evidence of the crime charged since it explained Bailey's presence and the immediate circumstances surrounding the charged offenses. *See, e.g., Welch v. United States*, 807 A.2d 596, 599–600 (D.C.2002); *(William) Johnson*, 683 A.2d at 1098; *Toliver v. United States*, 468 A.2d 958, 961 (D.C.1983). It is not clear from the record under which theory the evidence was admitted. Regardless, the result is the same, as any alleged error is harmless because appellant was not prejudiced by its admission. *See (James W.) Johnson*, 398 A.2d at 367. The trial court offered to give a limiting instruction, but apparently none was requested.

erly sought "to inflame the passions of the jury." Specifically, appellant objects to the prosecutor's comments during closing argument that Devon Taylor had been "tortured"; that the shooting was a "horrific inhumane crime" and a "horrific act against another human being"; that "[I]t's very difficult for us, as we sit here, to even imagine what this was like for Devon Taylor, the fear, the total shock of what was happening to him"; and, in rebuttal, that Taylor "ended up ... in a cold grave." At the end of closing arguments, appellant moved for a mistrial based on the prosecutor's comments. The motion was denied.

 This court has repeatedly cautioned that it is improper for the prosecutor to seek to place the jurors in the position of the victim. *See, e.g., Byers v. United States,* 649 A.2d 279, 290 (D.C. 1994) (citing *(William) Hawthorne v. United States,* 476 A.2d 164, 172 (D.C. 1984)). This admonition is a subset of the general rule that the prosecutor should not appeal to the jury's emotions and sympathy for the victim of a crime. *See (William) Hawthorne,* 476 A.2d at 172 (citing *Powell v. United States,* 455 A.2d 405, 410 (D.C.1982) (reversing conviction where the prosecutor's closing remarks were unsupported by the evidence and "clearly calculated to arouse the sympathy of the jurors for [the victim] and play on their personal fears about violence. We have and continue to condemn such emotional appeals")). Here, while the prosecutor's reference to "torture" appears inapt and inflammatory, and the references to the "horrific" act and "cold grave" had definite emotional appeal that may have "overdramatiz[ed] the facts"

in the jurors' minds, such language, "generally, without more, will not warrant reversal." *Byers,* 649 A.2d at 290 (citing *Thacker v. United States,* 599 A.2d 52, 61 (D.C.1991)). These statements are less inflammatory and personalized, for example, than those that required reversal in *Byers,* where the prosecutor told the jurors: "Don't you think that if your brain was bleeding, if there was blood, if your brain was hemorrhaging, don't you think if you had been beaten in the head, don't you think if you had been hit by a rake or a baseball bat or a fist, don't you think that if your brain started hemorrhaging...." 649 A.2d at 290 n. 9.

We have no doubt that the prosecutor's comments during closing were better left unsaid. But we also think it unlikely that the prosecutor's emotional appeals influenced the jury's verdict, given the strength of the government's evidence, which included several witnesses' narratives that appellant shot Taylor at close range in the back, in cold blood, in a feud between rival groups over drug turf. *See, e.g., Plummer v. United States,* 813 A.2d 182, 192 (D.C. 2002) ("Considering the significant evidence that appellant was the shooter, we do not believe that these comments substantially prejudiced appellant."). Additionally, in instructing the jury after the prosecutor's rebuttal, the trial court specifically told the jury to disregard any opinions on the evidence expressed by the lawyers.[15] *See, e.g., Finch v. United States,* 867 A.2d 222, 227–28 (D.C.2005) (finding that judge's instructions, similar to those here regarding the personal opinions of lawyers, sufficiently dissipated the

---

**15.** The judge told the jury in final instructions that "the statements and arguments [of the lawyers] are not evidence," and that "sometimes during argument a lawyer on one side or the other may appear to state a personal belief or opinion concerning the facts in the case and whether a witness can be believed.

A lawyer is not permitted to express such a personal opinion during argument; the lawyer only may argue to you based on what the evidence shows. So if you think a lawyer has expressed a personal belief or opinion during argument, disregard it and judge this case based only on the evidence."

effect of the improper remarks to with-stand plain error review). Thus, while the prosecutor's comments were improper, they did not substantially prejudice appellant, since "we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Plummer*, 813 A.2d at 191 (quoting *Powell*, 455 A.2d at 411).

The judgment of the trial court is

*Affirmed.*