*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CF-655

DEANGELO FOOTE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-15017-09)

(Hon. Russell F. Canan, Trial Judge)

(Argued May 30, 2013                                    Decided February 5, 2015)

*Christine A. Monta*, Public Defender Service, with whom *James Klein* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Kathryn L. Rakoczy*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman, John P. Mannarino*, and *Michael T. Truscott*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

PER CURIAM:  A jury found appellant Deangelo Foote guilty of first-degree premeditated murder and of related firearms offenses after a trial in which the court struck certain opinion testimony of the government's ballistics expert and

instructed the jury to disregard it as a remedy and sanction for the government's failure to disclose it to the defense in pretrial discovery as required by Criminal Rule 16 (a)(1)(E).[1] Appellant contends this relief was inadequate, and that the trial judge abused his discretion by declining to grant him a mistrial instead. We disagree. We conclude that appellant failed to make an adequate record to justify his request for a mistrial, and that the judge carefully and appropriately exercised his discretion in imposing the alternative sanction he selected. Accordingly, we affirm the judgment of conviction.

---

[1] In relevant part, Super. Ct. Crim. R. 16 (a)(1)(E) provides:

> At the defendant's request, the government shall disclose to the defendant a written summary of the testimony of any expert witness that the government intends to use during its case-in-chief at trial. . . . The summary provided under this subparagraph shall describe the witnesses' opinions, the bases and the reasons for those opinions, and the witnesses' qualifications.

Super. Ct. Crim. R. 16 (d)(2) provides in relevant part that:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other orders as it deems just under the circumstances.

## I.     Background

The evidence at trial established that on the afternoon of July 9, 2009, Kevin Allen was shot to death in an alley that runs behind N Street, S.W., between Half Street and First Street.  There was no dispute that appellant was in the alley at the time of the shooting; the parties stipulated that appellant was wearing a GPS tracking device that placed him there.

The government's first eyewitness was Darius Rowe, who testified that he, too, was in the alley just before the shooting and noticed that another man who was there — "Roger," also called "Roderick" — "was being robbed[.]"  Rowe testified that the assailant was appellant (whom Rowe knew as "D"), who was holding a gun and patting Roger's pockets, telling Roger to "give it up[.]"  Rowe described the gun as looking "[l]ike a rectangle, box," with a "long" ("not regular" but "longer") clip.[2]  Rowe testified that a tussle ensued between Roger and appellant and that Allen tried to break up the fight and separate the two men.  Eventually,

---

[2]  Rowe demonstrated the length of the clip with his hands, and agreed with the prosecutor that the length was about 18 inches.

Roger was able to grab the clip ("the thing that actually holds the bullets") and pull it out of the gun. Roger then ran towards First Street, and both Allen and appellant followed him. Rowe testified that he walked in the other direction, but shortly thereafter heard gunshots coming from the far end of the alley toward which the other men had run.

The second eyewitness to the incident in the alley was Ginee Stover, who was inside a residence at 60 N Street, S.W., located towards the Half Street end of the alley. Stover testified that she heard a commotion outside, including someone yelling the word "money," and looked out a second-floor window to see what was going on. She called downstairs to her son's father, Curtis Dorsey, and asked him to join her. Looking out the window, Stover saw appellant (whom she recognized as "D") walking down the alley in the direction of a group of "other boys," where there was "kind of a fight going on[.]" Much of the rest of the government's examination of Stover consisted of Stover saying that she did not remember what she saw and the prosecutor reading from the transcript of her grand jury testimony and eliciting her agreement that she had testified truthfully before the grand jury. Stover agreed that she had told the grand jury truthfully that, after fighting with Roger, appellant "drew a gun"; that appellant and Roger both fell to the ground while fighting; that one of the other boys tried to break up the fight; that when

Roger got up, he had the clip in his hand; that when appellant got up from the ground with a gun in his hand, he followed Roger and Allen and was walking fast, with the gun raised. Stover testified that the clip Roger had in his hand looked like a "[r]ectangle box." Stover eventually lost sight of appellant (i.e., appellant "left [her] field of vision") but, seconds or a minute thereafter, she "heard gunshots." After Stover heard the gunshots, she saw appellant coming back up the alley toward Half Street. Stover agreed that she truthfully told the grand jury that appellant still had the gun in his hand.[3]

Dorsey, the only witness who claimed to have seen the actual shooting, testified that from a window he saw "a group of guys" standing and talking in the alley behind the house at 60 N Street. He recognized Rowe, Roderick, and Allen. He then saw appellant ("Dee") arrive on the scene. Appellant and the other men in the alley stood and talked for a short time, and Dorsey then noticed that "everybody's smile[] just dropped . . . when the gun came up." Dorsey saw that

---

[3] Stover's identification of appellant as the shooter was impeached. For example, she initially told police that she did not know the people in the alley. Eventually, she identified appellant during her third interview with the police, but only after she knew that Dorsey had already identified appellant as the shooter. She did so when shown a single, confirmatory photograph of him. Stover also testified that she had seen the shooter in the neighborhood a few days after Allen was shot, a time when appellant was in custody.

appellant had in his hand a gun that looked like a "Mac ten." Dorsey testified that the gun had "a box shape[,] [l]ike a square," and he demonstrated with his finger the approximately one-inch-long length of the barrel. Dorsey said that after appellant pulled out the gun, the men in the alley started wrestling with him, trying to grab the gun. Dorsey testified that he saw Allen grab appellant and saw Roderick grab the clip (a "black [approximately seven-inch] long clip") and walk down the alley with it. Dorsey, who explained that by this time he had moved to his back door to continue watching, testified that appellant, still holding the gun, walked behind Roderick. Subsequently, Dorsey testified, he saw appellant (who by then was standing directly across from Dorsey's house) put the clip back in the boxy gun, look around, and then start shooting toward Allen. Appellant then turned away and ran.[4]

---

[4] Dorsey's testimony was impeached, by questioning his ability to see what happened in the alley and his interest in assisting the prosecution. Dorsey testified that he is "blind in [his] left eye" but has "[p]erfect . . . 20/20 vision" in his right eye. He also testified that he was able to ride a bicycle to get around without "any difficulty[.]" However, on cross-examination he said that he has glaucoma in both eyes that sometimes causes blurriness in his right eye. There were also inconsistencies in Dorsey's and Stover's testimony concerning where Dorsey was standing when the shooting occurred and whether he could see from that vantage point.

With respect to bias, Dorsey was charged with an unrelated weapons offense after the shooting in this case. Before appellant's trial, the prosecutor in appellant's case had spoken on Dorsey's behalf at the sentencing hearing, citing Dorsey's 911 call and identification of appellant. When asked on cross-

(continued…)

MPD Officer Eric Walsh testified that on the day after the shooting, he was assigned to "crime patrol" in the area near where the shooting occurred, in response to "information of a possible suspect [appellant Foote] in reference to the homicide." He testified that when he observed an individual who fit the description of appellant and called out his name, appellant looked over at him and "began to flee" and he (Officer Walsh) gave chase. A minute later, appellant was apprehended and arrested.

Crime scene technicians recovered eight expended cartridges, one unfired cartridge, and three bullet fragments in the alley where Allen's body was found. Most of the cartridge casings were found near the "cut" in the alley closest to First Street. No weapon was recovered, and there was no fingerprint or DNA evidence that linked appellant to the recovered ammunition.

---

(…continued)
examination whether "police kept pressuring him" to say he had been standing outside his mother's house when he saw the shooting, he said that they did.

There were inconsistencies between Dorsey's testimony before the grand jury and at trial, concerning the number of people present in the alley and whether a car had driven into the alley and the driver had told the shooter to get the clip. Dorsey and Stover gave different accounts of the shooter's apparel.

Robert Freese, a firearms examiner, examined the ballistics evidence and testified both as an expert witness and as a fact witness about his analysis. Consistently with his report and workpapers, which the government had given appellant in discovery, Freese testified that the eight expended cartridges recovered from the scene were all fired from the same weapon. He could not say whether two of the bullet fragments had come from the same gun, but had determined that one fragment was consistent with a 9mm Luger bullet. From the rifling on the bullets, Freese was able to say that "the guns that may have fired those bullets" included guns made by the manufacturers SWD, Astra, Barretta, IMI, Lama, Sig Arms, Smith & Wesson, Stalwart Arms, and Worthier.

Freese further testified that as part of his ballistics examination, he looked at the firing pin and breech face impressions left on the cartridge primer. When the prosecutor asked Freese about his observations, Freese said that he observed "a rectangular firing pin impression with a circle around it." He also gave the following opinion, which was the basis for the defense's Rule 16 objection:

> [T]he firing pin impression and the bre[e]ch face impression are unique impressions that's [sic] consistent with a Mac 10 or Mac 11-type weapons.

After Freese gave that testimony, the prosecutor asked him about the length of the barrel of a Mac 10. Freese testified that the barrel length of the Mac 10 varies, but that "[t]he ones we usually see in the street are somewhere about five-and-a-half inches" and "[a] little bit of the barrel protrudes out the front end about two inches[.]" He added that Mac 10s "do have some other sized barrels, but that's the standard I usually see working in the Firearms Unit." Asked by the prosecutor to describe the shape of a Mac 10, Freese testified that the Mac 10 is a "boxy-type" or "rectangular shaped weapon about eleven inches in length."

Appellant's trial counsel did not immediately object to Freese's testimony about the "unique" firing pin and breech face impressions of the Mac 10 and Mac 11, but, after the prosecutor completed his direct examination of Freese and after a short recess, counsel told the court that the defense had not been "given specific notice," in either Freese's expert report or in the government's Rule 16 (a)(1)(E) summary of his anticipated opinion testimony, that Freese would testify about "unique characteristics [left when cartridges are] fired from a Mac 10 or Mac 11." All that had been disclosed, counsel asserted, was Freese's opinion that "a number of guns . . . could have left the impressions" on the bullets found at the scene. Counsel told the court, "I'm asking that the [c]ourt exclude it and actually move for a mistrial."

In response, the prosecutor argued that the government had given the defense sufficient notice of Freese's opinion, citing the following grounds for this assertion: that the Mac 10 is made by one of the possible manufacturers (SWD) specifically listed in Freese's report; that the government disclosed in its Rule 16 (a)(1)(E) summary that the basis for Freese's testimony would be "his observations made during his examination of the ballistic evidence," including the cartridge cases, and his "education, training and experience as a firearms examiner"; that the prosecutor also had given the defense Freese's cartridge case worksheet, notes, and a photograph showing the firing pin and breech face impressions on a cartridge, thus giving the defense notice of what Freese did and what he would be testifying about; and that the prosecutor had "invited the [d]efense to talk to Mr. Freese."

Defense counsel rejoined that nothing in the discovery provided by the government revealed that Freese would "testify that the firing pin impression in this case is so unique that it was left by a Mac 10 or a Mac 11[.]" Counsel stated, "I'd ask the Court again either for a mistrial, given the damaging testimony that was elicited by the Government that should have been provided to us under Rule 16 previously or I'd ask the Court to strike that testimony and I guess we'll figure out a way to tell the jury that they cannot consider it."

The foregoing exchange took place late in the day, and the judge did not rule until the next day. The judge found that there had been a discovery violation and that the defense had not been "notified properly" of Freese's opinion. However, the judge added, he found no "bad faith" and "was not inclined to grant a mistrial." Instead, the judge told the parties, he was "inclined to strike the testimony with an instruction," though he was open to granting the defense a four- to five-day continuance if the defense wanted one in order to consult a ballistics expert of its own. If a continuance were granted for the defense to get an expert, the judge stated, he would "allow [Freese's] testimony in."

Defense counsel then asked the judge what instruction he intended to give the jury if he struck Freese's testimony about the uniqueness of the firing pin impression. The judge responded that he "would recommend that we not bring attention to that testimony," though he would "defer to the defense" on whether or not to do so:

> If you wanted me to strike exactly what was said and repeat it, then I would do that and I would say something along the lines that I gave you an example in the opening instructions that sometimes counsel doesn't really have

an opportunity to object to something, but then they later move to strike it and there are generally two reasons why I would do that and it's just not appropriate testimony in this case and I strike it from your consideration—you're not to consider it at all as if it never happened and you are not allowed to consider it at all during your deliberations and that's a pretty strong instruction and I would repeat it during final instructions.

Defense counsel said, "That probably could work out. That sounds fairly good." Counsel added that it appeared the jurors had picked up on Freese's testimony ("we did notice jurors taking notes when they heard that"). The judge responded that this was nonetheless a situation in which "[t]he law assumes" the jury would follow the instruction to disregard the testimony. However, the judge added, his "preference" was to continue the case to allow the defense to secure an expert and not have to strike Freese's testimony. "[T]hat's the best response," the judge stated, "because the jury gets all the information, you have a fair opportunity to meet it eventually and if for your own reasons you think that is what you want to do, then that's fine."

The court thereafter took a recess, during which defense counsel was able to get a photograph of the firing pin and breech face impressions to the Public Defender Service forensics group. When court re-convened, the defense team told

the court that they would need about 40 minutes to decide whether to request a continuance. Eventually, defense counsel advised the court that "because we didn't open and we didn't cross[-examine] people the way we would [have if the government had disclosed Freese's opinion that the firing pin impression was left by a Mac 10 or Mac 11], we don't think it's going to help" merely to call a defense expert and "[w]e actually haven't really been able to line it up, anyway."[5] Appellant therefore did not request a continuance; rather, counsel concluded, "[w]e did ask for a mistrial and in lieu of a mistrial, we would ask for an instruction."

After a colloquy with the parties in which he again expressed a willingness to "defer to the defense" about whether to repeat the testimony that the jury was to disregard, the judge proposed giving the following limiting instruction:

> You've heard evidence from Mr. Freese that Exhibits 22 and 23, the bullets, have rifling characteristics that could have been manufactured from nine manufacturers, including the manufacturer of the Mac 10.[6] [Y]ou also

---

[5] The record does not make clear whether the "it" that defense counsel had not been able to "line up" was an available expert or an expert who would *dispute* Freese's opinion.

[6] Actually, the jury had not heard testimony, from Freese or from any other witness, that SWD was the manufacturer of the Mac 10; the jury heard that information only after the judge gave the jury the curative instruction. The judge

(continued…)

> heard evidence regarding the shape and form of a Mac 10 firearm. To the extent that there was any other evidence regarding the Mac 10, you are to completely and totally disregard it[.]

Following some further discussion regarding how specific to make the last sentence of this instruction, the judge suggested amending it to say "regarding *the identification of* the Mac 10" without repeating, and thereby emphasizing, the precise testimony the jury was to disregard. "[I]f you go too much further," the judge explained, "you might as well go back and say what we're talking about. . . . I think by just saying the identification of the Mac 10 and there obviously will be no argument on that, so we can trust our jury then to follow this instruction." The prosecutor agreed that "[t]here will be no argument on the firing pin impression or breech face." After the judge then confirmed that he did not intend to strike Freese's (supposed) testimony regarding the possibility that a Mac 10 could have fired the bullets based on their rifling characteristics, or his testimony regarding the

---

(…continued)
had heard the information from the prosecutor during the colloquy. However, the defense did not object to inclusion of the information in the instruction, and appellant does not raise this as an issue on appeal.

boxy shape of the Mac 10,[7] defense counsel and the prosecutor agreed that the judge's proposed wording of the instruction was "fine."

Accordingly, following the defense cross-examination of Freese and his re-direct examination by the prosecutor, the judge instructed the jury as follows:

> [W]e have a situation here where I am going to ask you to disregard some testimony and I am going to strike some testimony.
>
> So, let me be specific about that. Now, you've heard testimony from Mr. Freese that Items 22 and 23, the bullets, have rifling characteristics that could have been manufactured from nine manufacturers, including the manufacturer of the Mac 10.
>
> You've also heard evidence from him regarding the shape and form of a Mac 10 and that's evidence that you may consider during your deliberations.
>
> What I'm striking, though, from the record is to the extent that there was any other evidence regarding the identification of the Mac 10, you are to completely and totally disregard such testimony.
>
> So, to the extent that there was any other evidence regarding the identification of the Mac 10, you are to completely and totally disregard that testimony. I will repeat this instruction with my final instructions and as I gave my example in the beginning of the trial, if someone should mention things that are not limited to what I said

---

[7] Appellant did not ask the court to strike this testimony.

was in the record and starts talking about things that are no longer in the record, other jurors should remind that juror that that type of evidence has been stricken from the record and you are not allowed to consider it.

The judge reiterated this instruction at the close of trial.

During his closing argument to the jury, the prosecutor argued:

Mr. Freese also indicates that he examined the bullets in this case . . . and he gave a series of eight or nine different types of guns that may have fired those bullets. . . . [H]e said there were eight or nine possibilities, but one of them he described as being an SWD, the manufacturer of the Mac 10 and why is that important? Well he also described the Mac 10 and what it looked like. He said it's a kind of boxy shaped and it has the little nubby barrel at the end of it[.] . . . Do you remember somebody doing that earlier in the case? Who else did that? Mr. Dorsey did that. Remember when he was describing the gun? He held his fingers up and he also said it was a boxy shaped gun, just like Ms. Stover. Curious with his terrible vision as the Defense tried to have you believe on cross examination, he was able to get the shape of the gun right and the length of the barrel[.] . . . Now in all fairness to the Defense, Mr. Freese did not say this absolutely was a Mac 10 and he did say that there were eight or nine different guns that may have fired or made those impressions, but isn't it a remarkable coincidence that he described one of those guns the exact same way that two of the key witnesses did[?]

Following the government's closing argument, defense counsel renewed its motion for mistrial, objecting to the prosecutor's reference to "[w]ho else described the . . . barrel of the gun being one or two inches?" The court again denied defense counsel's motion for mistrial, agreeing with the government that the closing statement "was well within the evidence and [the court's] instructions to talk about the Mac 10[.]"

Appellant now contends that the judge abused his discretion in refusing to grant a mistrial because "a mistrial was the only remedy that could cure the government's deliberate nondisclosure of Freese's Mac 10 opinion." He argues that the sanction the judge chose—instructing the jury to disregard a portion of Freese's testimony—"could not and did not redress the harm of the government's deliberate rule violation."

## II.    Standard of Review

"If the government . . . fails to satisfy its discovery obligations, the decision as to what sanctions should be imposed or whether to impose any sanctions at all are matters committed to the trial court's discretion." *Simmons v. United States*,

999 A.2d 898, 901 (D.C. 2010) (internal quotation marks omitted). Thus, "in reviewing a denial of a request for sanctions, we must ascertain whether the trial court abused its discretion." *Ferguson v. United States*, 866 A.2d 54, 59 (D.C. 2005); *see also Hallman v. United States*, 410 A.2d 215, 217 (D.C. 1979) (noting that the decision to grant or deny a motion for mistrial is committed to the trial court's broad discretion). Because "mistrials entail substantial costs and are disfavored in this as in other situations . . . we will reverse the decision to deny a mistrial only if the decision appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Shotikare v. United States*, 779 A.2d 335, 347 (D.C. 2001) (internal quotation marks omitted).

### III.    Analysis

Appellant argues that the trial judge "fail[ed] to realize the necessity of a mistrial" because he misapplied the three so-called *Lee* factors that we have said a court "must consider and weigh" in fashioning a sanction for the government's "failure to make proper disclosure under Rule 16[.]" *Lee v. United States*, 385 A.2d 159, 163 (D.C. 1978). Those factors are: "(1) the reasons for the nondisclosure; (2) the impact of the nondisclosure on the trial of the particular

case; and (3) the impact of a particular sanction on the proper administration of justice in general." *Id.* (citations omitted). By misapplying these factors, appellant contends, the judge abused his discretion in denying a mistrial.

We are not persuaded by appellant's argument. As we shall explain, the record demonstrates that the trial judge appropriately exercised his discretion in opting to strike, and to instruct the jury to disregard, the previously undisclosed opinion testimony of the government's expert witness rather than declaring a mistrial. The judge correctly recognized that the government had violated its discovery obligations under Rule 16 and that the violation was a serious and potentially prejudicial one that necessitated a satisfactory remedy and sanction. In deciding what sanction to impose, the judge thoroughly inquired of the parties and carefully considered and weighed each of the three *Lee* factors. Furthermore, while appellant made several requests for a mistrial, he did not convincingly argue why a mistrial was necessary and appeared to agree that instructing the jury to disregard the expert's testimony would be a satisfactory alternative remedy. Nor did appellant dispute the adequacy of the particular instruction the judge gave the

jury.  Thus, appellant failed to make an adequate record in support of a mistrial as opposed to the alternative sanction the judge selected.[8]

## A. The First *Lee* Factor

The first *Lee* factor required the trial judge to inquire into and assess the reasons for the government's failure to disclose in advance of trial that its ballistics expert would testify that a Mac 10 or Mac 11 made the firing pin and breech face

---

[8]  It perhaps bears emphasizing that appellant never suggested in the trial court that a mistrial was required because the expert's opinion could be helpful to his defense if he were afforded an opportunity to incorporate it into his preparation and strategy.  Many of the factual assertions appellant makes on appeal as to how the defense could have proceeded and how the trial would have been different had a mistrial been granted were not made to the trial judge; and especially because they involve factual considerations, the judge cannot be faulted for not considering them *sua sponte*.

We are cognizant that counsel are not expected to present, in the midst of trial, arguments as thought-out as counsel have been able to prepare and present on appeal — particularly in response to unexpected testimony.  But the trial court expressed its preference to have the jury hear the government expert's full opinion and permit the defense to respond to it. At the time, it appears that the response was expected to be from a countervailing defense expert who would contradict or question Freese's opinion.  The judge offered a continuance to permit defense counsel to obtain such an expert, an offer that defense counsel declined.  Counsel did not ask for additional time to consider further implications of Freese's testimony, such as its potential usefulness to the defense, an argument newly made on appeal.  We cannot fault the trial judge for not having conceived of that rather counter-intuitive proposition, cogent as it may be when presented on appeal.

impressions observed on the cartridge primer. The judge did so. Preliminarily, the judge found that this information was indeed not disclosed in, or readily discernible from, the expert's report and worksheets or the other discovery the government had provided to the defense. Although that material included a photograph of the firing pin and breech face impressions, and — at the prosecutor's invitation — defense counsel interviewed Freese in advance of trial, the judge recognized that this did not put the defense on notice of what the expert might say on this particular point and fell short of the disclosure that should have occurred under Criminal Rule 16.[9] The judge took defense counsel's "word that she was surprised" by Freese's testimony.[10]

---

[9] We agree with appellant and the trial court that the government's disclosure did not come close to satisfying the requirements of Rule 16 with respect to Freese's testimony identifying the weapon that left the firing pin and breech face impressions as a Mac 10 or Mac 11 (and the government itself no longer contends otherwise). The disclosure of the photograph of the impressions and other information may have supplied appellant with the bases of Freese's opinion, but it "fail[ed] to summarize [Freese's] expected testimony [and] . . . describe [his] actual opinions[.]" *Murphy-Bey v. United States*, 982 A.2d 682, 688 (D.C. 2009).

[10] We note, however, that prior to the court's decision on what sanction to impose, defense counsel told the court that "a few weeks before trial," she met with Freese and asked him "about what was in the report[.]" Counsel said that Freese had mentioned the Mac 10. She also acknowledged that she said to Freese during the interview "something like the Mac 10 wasn't listed on there. Does that mean that's not one of the firearms and he said well . . . the SWD manufactured it." Thus, as the prosecutor emphasized to the court, defense counsel was able to "even include the Mac 10" in her discussion with Freese. Further, defense counsel made

(continued…)

The judge also found that the prosecutor had no sound reason for this failure of disclosure. The prosecutor denied having purposefully withheld Freese's opinion as to the identity of the weapon from the defense in discovery; he professed not to have focused on this particular information or appreciated its potential significance.[11] Even so, the prosecutor admittedly learned of Freese's opinion over a month before trial; he was not under the mistaken impression that he actually had disclosed it to the defense; and his elicitation of that opinion at trial was not inadvertent. The judge perceived that the prosecutor "had to be aware of the significance of this type of testimony."

_____

(…continued)

no objection when the prosecutor reminded the court that, during the meeting with Freese, "there was a conversation about the nature of the SWD gun and that it was in fact explained to her that that was the manufacturer of the Mac 10." She also candidly acknowledged to the court that she could not recall whether the "specific issue [of the firing pin or breech face impressions] came up" during the meeting with Freese.

[11] Before the court determined what sanction to impose, the prosecutor explained that his questioning that elicited Freese's undisclosed opinion was focused not on establishing that the spent cartridges came from a Mac 10 (the prosecutor said that he "didn't really think about that particular part of it"), but on teeing up an opportunity for Freese to describe "what a Mac 10 looked like," with the "idea being that his description would be consistent with the way Mr. Dorsey and Ms. Stover described it." The prosecutor told the court that he could not even recall what Freese had said about the breech face impression. The prosecutor also pointed out that Freese's statements were about "the consistency of the gun" with a Mac 10 or Mac 11, and that Freese had not said that the gun "was a Mac 10."

Ultimately, while he faulted the government for having "played it too close to the vest," the judge took the prosecutor at his word that he had not withheld Freese's opinion with the intent to deceive the defense or gain a tactical advantage, and that he honestly thought he had complied with Rule 16. Appellant takes issue with this credibility assessment and argues that the judge should have found that the prosecutor acted in bad faith — a finding that, appellant contends, would have weighed heavily in favor of granting his request for a mistrial.[12]

This was not appellant's position at trial, however. His counsel told the trial judge that the defense "certainly [was]n't suggesting that there was bad faith" and that the prosecutor had been "very helpful turning over things." This would be enough for us to reject appellant's argument, for "[w]e have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal." *Brown v. United States*, 627 A.2d 499, 508 (D.C. 1993). But even if we excuse appellant's reversal of position on appeal, we cannot say the trial judge, who had the advantage of assessing the prosecutor's demeanor, clearly erred in

---

[12] *Cf. Wiggins v. United States*, 521 A.2d 1146, 1149 (D.C. 1987) (noting that "a negligent failure to disclose does not invite severe sanctions to the extent that a purposeful withholding would").

crediting the prosecutor's good faith. The judge in fact articulated a legitimate reason for coming to that conclusion — essentially, that after the prosecutor had provided Freese's work papers to the defense and had learned of Freese's undisclosed opinion, he undertook to make Freese available to defense counsel for an interview in which counsel could explore the expert's views without any limitations. This was not sufficient to comply with the prosecutor's obligations under Rule 16, and we do not suppose it was reasonable for the prosecutor to assume Freese would make the necessary disclosure to defense counsel when the prosecutor had not specifically asked him to do so. But the judge reasonably could find, as he did, that the prosecutor's invitation to defense counsel to interview Freese "militate[d] against any conclusion of bad faith"[13] (especially given defense counsel's assurance that appellant was not questioning the prosecutor's good faith).

In sum, we are satisfied that the trial judge did not erroneously exercise his discretion in assessing the first *Lee* factor. While that factor supported the

---

[13] *Cf. United States v. Christopher*, 923 F.2d 1545, 1555 (11th Cir. 1991) (holding that the district court did not abuse its discretion in denying a motion for mistrial after the government failed to meet its Fed. R. Crim. P. 16 obligation to disclose certain statements and then offered them in evidence through witness Ramey, reasoning that "Ramey was made available to Christopher's counsel so that he could have learned Ramey's testimony").

imposition of a stern and effective sanction in this case, we cannot agree with appellant that it weighed in favor of declaring a mistrial.

## B. The Second *Lee* Factor

The second *Lee* factor required the judge to consider the impact of the non-disclosure on the trial — an inquiry that logically must encompass not only the significance of the new evidence and the defendant's ability to respond to it, but also the efficacy of any remedial measures offered or implemented by the judge. The necessary consideration was not slighted in this case.

Appellant's counsel informed the judge of the significance of Freese's undisclosed opinion that, based on the firing pin and breech face impressions, the murder weapon was a Mac 10 or Mac 11. Counsel explained that Freese's testimony conveying this opinion was "extremely prejudicial" to appellant because it was the strongest corroboration the prosecution had of Dorsey's claim to have seen appellant commit the murder — "when our case rests," counsel stated, "on whether or not Mr. Dorsey was able to identify what he said he was able to

identify."[14]  Counsel further explained that, because this opinion came as a surprise, appellant was unprepared to meet its force.  In particular, counsel noted, the defense had not consulted its own expert to determine whether Freese's opinion was correct, and it had not seen the necessity to impeach Dorsey with a prior statement he had made to the police, in which he had identified the weapon in appellant's hands as a "Mac 90."

Because the strengths and weaknesses of the government's other witnesses against appellant were fully aired before the jury, the actual importance of Freese's undisclosed opinion to the prosecution case might be questioned.  In considering the second *Lee* factor, the trial judge recognized that the government had presented other, if arguably less powerful, corroboration of Dorsey, including but not limited to the admissible forensic corroboration from Freese that the murder weapon could

---

[14]  Appellant argues that Freese's testimony "made it considerably more likely that Dorsey had in fact seen *the shooting*." (italics added).  Arguably, though, Freese's additional testimony, about variation in the appearance of Mac 10s and about the five-and-a-half inch barrel he typically saw on Mac 10s, tended to undermine Dorsey's description of a one-inch barrel (and Rowe's description of an eighteen-inch clip also did not jibe with Dorsey's description of a seven-inch clip).  Further, even if, as the prosecutor argued to the jury, Freese's testimony helped to establish that Dorsey "g[o]t the shape of the gun right," Rowe's and Stover's descriptions, too, had bolstered Dorsey's description of the gun as "boxy."

have been a Mac 10 based on both the rifling characteristics and the physical description of the gun given not only by Dorsey but also by other witnesses.

But we need not attempt to calibrate the potential impact of Freese's undisclosed opinion on the trial too finely, because the trial judge did not minimize it. On the contrary, the judge castigated the prosecutor's apparent obliviousness to the importance of disclosing that information prior to trial, as described above, and he undertook to protect appellant from any unfair adverse impact of Freese's undisclosed opinion. The judge did so, primarily, by offering appellant the choice of either a continuance to secure a defense expert of his own and thereby have a fair opportunity to confront the issue head on (which appellant declined),[15] or the remedy the judge ultimately did adopt of striking Freese's undisclosed opinion testimony and instructing the jury to disregard it — an attempt to nullify the adverse impact of the Rule 16 violation that defense counsel stated "probably could work out."

---

[15] The court also offered to recall Dorsey to the stand for further cross-examination; appellant did not pursue this option.

In deciding that his curative instruction would be effective, the judge noted he had forewarned the jurors at the outset of the trial that they might be instructed after an objection to completely disregard testimony and not to consider it during their deliberations, and that if a juror should refer to such testimony during deliberations, the other jurors should remind that juror that it had been stricken and that the jury was not allowed to consider it at all.  Thus, the opening instructions had primed the jury to be receptive to the curative instruction pertaining to Freese's testimony.

Our cases recognize that an instruction not to consider stricken testimony is usually a sufficient remedy where a jury has heard damaging testimony it should not have been permitted to hear.[16]  In such cases, we have said, "we must presume that a jury follows the court's instructions, absent any indication to the contrary." *Lewis v. United States*, 930 A.2d 1003, 1008 (D.C. 2007).  To be sure, "[c]ases

---

[16]  For instance, in *Peyton v. United States*, 709 A.2d 65 (D.C. 1998), the government's star witness, whose testimony that he saw the defendants shoot the victim was impeached with his initial grand jury testimony denying any knowledge of the killers, twice volunteered on redirect that he had taken a lie detector test — statements that had, we acknowledged, "a substantial potential for prejudice." *Id.* at 65.  We nonetheless held that the trial judge's admonition to the jury to disregard the testimony sufficed to minimize the possibility of prejudice, and that the judge therefore did not abuse her discretion by denying the defendants' motions for a mistrial. *See id.* at 71-74.

may arise in which the risk of prejudice inhering in material put before the jury may be so great that even a limiting instruction will not adequately protect a criminal defendant's . . . rights." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) (citing, as examples of such cases, *Bruton v. United States*, 391 U.S. 123 (1968), and *Jackson v. Denno*, 378 U.S. 368 (1964)). But "[a]bsent such extraordinary situations, . . . we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *Id.*

In the present case, appellant did not provide the trial judge with any reason to think the curative instruction would be ineffective, and on appeal he has identified no reason for this court to second-guess the trial judge on that score. We appreciate that the instruction could have been clearer in identifying the precise testimony the jury had to disregard; it focused the jury more on what it *could* consider than on what it could not. This, however, reflected a considered judgment that it would be better not to emphasize the stricken testimony by repeating it. That judgment was not unreasonable; and we think the instruction was clear enough, especially since appellant did not object to its clarity. The prosecutor helpfully reinforced the court's prohibition when he told the jury in his closing argument that "Mr. Freese did not say this absolutely was a Mac 10 and he did say

that there were eight or nine different guns that may have fired or made those impressions."

In sum, we are satisfied that the trial judge appropriately addressed the second *Lee* factor. We cannot say that the information available to the judge about the impact of the non-disclosure on the trial should have led the judge to decide that it was necessary to impose a sanction more severe than striking a portion of Freese's testimony.

### C. The Third *Lee* Factor

The third *Lee* factor calls for consideration of "the impact of [the] particular sanction on the proper administration of justice in general[.]" *Lee*, 385 A.2d at 163. The judge gave this factor explicit consideration when he weighed the sanction of striking the testimony against the alternative of granting a mistrial. In brief, the judge rejected a mistrial for sound reasons relating to administration of justice concerns — while mistrials are sometimes necessary, they are disfavored precisely because of their adverse consequences for the administration of justice — and he selected a meaningful sanction calculated not only to remedy the prejudice

to appellant but also to dissuade the government from surprising the defense at trial with evidence it wrongfully failed to disclose in discovery.

Appellant argues that the judge improperly considered the government's ability to "prove its case" when the government had created the problem by its deliberate failure to disclose Freese's expected testimony. In addition, appellant agrees that the judge failed to consider the "bad incentives" that failing to grant a mistrial would create for prosecutors in future cases. We do not agree.

The judge recognized that the "witnesses to this case are reluctant at best to be here," a comment in part reflective of the fact that it was necessary for the court to issue a bench warrant to secure Rowe's presence at trial and that Stover was such a reluctant witness that her initial testimony on direct had to be contradicted by the prosecutor's reading of her testimony before the grand jury.[17] Thus, if, as appellant asserts, the judge was required to make a "particularized finding that granting a mistrial would pose some undue detriment to *this proceeding*," he had the basis for, and his comment conveyed, such a finding. In explaining why a

---

[17] The judge also had heard the government's pretrial proffer that Stover had been approached by individuals (appellant's mother and another individual who was listed as a possible defense witness) who told her that "the only reason why she [was] still alive" was because of appellant's mother.

mistrial is "a step to be avoided whenever possible," this court has emphasized the "substantial social costs" a mistrial entails, including, *inter alia*, that the "dispersion of witnesses may render retrial difficult, even impossible," such that "while reversal may, in theory, entitle the defendant only to retrial, in practice it may reward the accused with complete freedom from prosecution[.]" *Salmon v. United States*, 719 A.2d 949, 956 (D.C. 1997) (quoting *United States v. Mechanik*, 475 U.S. 66, 72 (1986)) (citations, internal quotation marks, and brackets omitted). While "[t]he price of a retrial is one that society must be prepared to pay if the defendant's initial trial was unfair[,]" *id.*, it was not inappropriate for the trial judge to consider those potential costs in determining which sanction to choose, so long as the judge was satisfied that appellant had been afforded "a fair opportunity to meet" the government's evidence. Whether the defense's requested sanction would "hinder[] the administration of justice" was an appropriate consideration. *Wiggins* 521 A.2d at 1149.

Finally, appellant's argument about "bad incentives" overlooks that exclusion of Freese's testimony was itself an "extreme sanction." *United States v. Rodriguez*, 765 F.2d 1546, 1557 (11th Cir. 1985) (internal quotation marks omitted). "[H]aving the testimony stricken from the record . . . is the most severe remedy a court can impose short of declaring a mistrial." *United States v. Thai*, 29

F.3d 785, 806 (2d Cir. 1994) (internal quotation marks omitted); *see also Sowell v. Walker*, 755 A.2d 438, 447 (D.C. 2000) (agreeing that "striking testimony can be a severe remedy").

## IV.   Conclusion

This court has long held that "[w]henever possible, the court should seek to avoid a mistrial by appropriate corrective action which will minimize potential prejudice." *Goins v. United States*, 617 A.2d 956, 958 (D.C. 1992).  Thus, appellant has a difficult burden in establishing that the trial judge abused his discretion by declining to order a mistrial.  That burden is compounded by the "almost invariable assumption of the law that jurors follow their instructions." *Plater v. United States*, 745 A.2d 953, 959 (D.C. 2000) (internal quotation marks omitted).  We conclude for all the foregoing reasons that appellant has not met that burden.  We hold that the trial judge did not abuse his discretion when he sanctioned the government for its Rule 16 violation by striking the undisclosed portion of the ballistics expert's testimony and denied appellant's request for the alternative sanction of a mistrial.  Accordingly, the judgment of conviction is

*Affirmed.*